# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN THE MATTER OF THE LIQUIDATION    )      C.A. No. 2019-0175-JTL
OF SCOTTISH RE (U.S.), INC.              )

## OPINION REGARDING CLAIMS PROCEDURES

Date Submitted: July 21, 2025
Date Decided: November 28, 2025

GianClaudio Finizio, BAYARD, P.A., Wilmington, Delaware; James J. Black, III, Jeffrey B. Miceli, Mark W. Drasnin, BLACK & GRENGROSS, PC, Philadelphia, Pennsylvania; *Counsel for The Honorable Trinidad Navarro, Receiver for Scottish RE (U.S.), Inc.*

Ricardo Palacio, Catherine A. Gaul, ASHBY & GEDDES, P.A., Wilmington, Delaware; Eric A. Haab, FOLEY & LARDNER LLP, Chicago, Illinois; Matthew D. Lee, FOLEY & LARDNER LLP, Madison, Wisconsin; *Counsel for Sun Life Assurance Company of Canada and Sun Life and Health Insurance Company (U.S.), Protective Life Insurance Company, Protective Life and Annuity Insurance Company, West Coast Life Insurance Company, MONY Life Insurance Company, American General Life Insurance Company, and The United States Life Insurance Company in the City of New York.*

Joseph B. Cicero, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Suman Chakraborty, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C., New York, New York; *Counsel for Berkshire Hathaway Life Insurance Company of Nebraska.*

Joseph B. Cicero, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; John S. Pruitt, EVERSHEDS SUTHERLAND (US) LLP, New York, New York; *Counsel for Ameritas Life Insurance Corp., Ameritas Life Insurance Corp. of New York, Augustar Life Insurance Company (f/k/a Ohio National Life Insurance Company), Augustar Life & Annuity Company (f/k/a Ohio National Life Assurance Corporation), Pacific Life Insurance Company, Pacific Life and Annuity Company, Columbus Life Insurance Company, Integrity Life Insurance Company, and Security Benefit Life Insurance Company.*

Joseph B. Cicero, CHIPMAN BROWN CICERO & COLE, LLP, Wilmington, Delaware; Deirdre G. Johnson, MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND POPEO, P.C., Washington, D.C.; *Counsel for Nationwide Life Insurance Company and Nationwide Life and Annuity Insurance Company.*

John C. Phillips, Jr., David A. Bilson, PHILLIPS, MCLAUGHLIN & HALL, P.A., Wilmington, Delaware; Cynthia J. Borrelli, BRESSLER, AMERY & ROSS, P.C., Florham Park, New York; *Counsel for Hannover Life Reassurance Company of America and Security Life of Denver Insurance Company.*

John L. Reed, Peter H. Kyle, Michael A. Carbonara, Jr., DLA PIPER LLP (U.S.), Wilmington, Delaware; Stephen W. Schwab, DLA PIPER LLP (U.S.), Chicago, Illinois; *Counsel for SCOR Global Life Americas Reinsurance Company, SCOR Global Life Reinsurance Company of Delaware, and SCOR Global Life USA Reinsurance Company, SCOR SE, SCOR Global Life SE (Deutschland) AG, SCOR Rucksversicherung (Deutschland) AG, and Toa Reinsurance Company, Limited of Tokyo, Japan.*

Kevin J. Mangan, WOMBLE BOND DICKINSON (US) LLP, Wilmington, Delaware; Kevin P. Griffith, FAEGRE DRINKER BIDDLE & REATH LLP, Indianapolis, Indiana; *Counsel for Brighthouse Life Insurance Company, Brighthouse Life Insurance Company of NY, Genworth Life Insurance Company, Genworth Life and Annuity Insurance Company, Genworth Life Insurance Company of New York, United of Omaha Life Insurance Company, Companion Life Insurance Company, New York Life Insurance and Annuity Corporation, SBLI USA Life Insurance Company, Inc., S. USA Life Insurance Company, Inc., Shenandoah Life Insurance Company, North American Company for Life and Health Insurance, Midland National Life Insurance Company, Athene Annuity and Life Company, and Athene Annuity & Life Assurance Company of New York.*

Kevin J. Mangan, WOMBLE BOND DICKINSON (US) LLP, Wilmington, Delaware; *Counsel for The Guardian Life Insurance Company of America, United Heritage Life Insurance Company, The Savings Bank Mutual Life Insurance Company of Massachusetts, USAA Life Insurance Company, and USAA Life Insurance Company of New York.*

Gary W. Lipkin, Devan A. McCarrie, Allison M. Neff, SAUL EWING ARNSTEIN & LEHR, LLP, Wilmington, Delaware; Ira J. Belcove, Teresa Snider, PORTER WRIGHT MORRIS & ARTHUR LLP, Chicago, Illinois; *Counsel for Lincoln National Life Insurance Company, Lincoln Life and Annuity Company of New York, and First Penn Pacific Life Insurance Company.*

Travis S. Hunter, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Ana M. Alfonso, O'MELVENY & MYERS, LLP, New York, New York; *Counsel for Transamerica Life Insurance Company.*

Travis S. Hunter, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Richard Mancino, WILLKIE FARR & GALLAGHER LLP, New York, New York; *Counsel for Everlake Life Insurance Company (f/k/a Allstate Life Insurance Company)*.

Joseph C. Schoell, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; *Counsel for Banner Life Insurance Company, National Benefit Life Insurance Company, Police and Fireman's Insurance Association, and Kansas City Life Insurance Company*.

Joseph C. Schoell, FAEGRE DRINKER BIDDLE & REATH LLP, Wilmington, Delaware; Kevin P. Griffith, FAEGRE DRINKER BIDDLE & REATH LLP, Indianapolis, Indiana; *Counsel for RGA Reinsurance Company and Beneficial Life Insurance Company*.

Kelly A. Green, Jason Z. Miller, SMITH, KATZENSTEIN & JENKINS LLP, Wilmington, Delaware; Carl Micarelli, DEBEVOISE & PLIMPTON LLP, New York, New York; *Counsel for Employers Reassurance Corporation, The Prudential Insurance Company of America, Metropolitan Life Insurance Company, and Metropolitan Tower Life Insurance Company*.

Jennifer R. Hoover, Noelle B. Torrice, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Wilmington, Delaware; Thomas D. Cunningham, SIDLEY AUSTIN LLP, Chicago, Illinois; *Counsel for Jackson National Life Insurance Company*.

Jennifer R. Hoover, Noelle B. Torrice, BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP, Wilmington, Delaware; *Counsel for Lincoln Benefit Life Company and United Life Insurance Company*.

Joelle E. Polesky, STRADLEY RONON STEVENS & YOUNG LLP, Wilmington, Delaware; Jeffrey D. Grossman, STRADLEY RONON STEVENS & YOUNG LLP, Philadelphia, Pennsylvania; *Counsel for American Council of Life Insurers*.

Jody C. Barillare, MORGAN LEWIS & BOCKIUS LLP, Wilmington, Delaware; *Counsel for Columbian Mutual Life Insurance Company*.

**LASTER, V.C.**

Scottish Re (U.S.), Inc. ("SRUS" or the "Company") is an insolvent insurer. The Insurance Commissioner of the State of Delaware (the "Commissioner") obtained an order placing the Company in liquidation under the Delaware Uniform Insurance Liquidation Act ("DUILA"). The Commissioner is serving as receiver and conducting the liquidation.

The Commissioner seeks court approval for procedures to govern a claims process. Various stakeholders objected to aspects of the procedures (the "Objectors").[1]

A threshold question involves the standard of review that the court applies when determining whether to adopt the procedures. This decision holds that the procedures must both comply with law (principally DUILA) and otherwise not constitute an abuse of discretion.

Another question is the standard of review for considering the Commissioner's claim recommendations. Under the proposed procedures, the Commissioner will evaluate each claim in the first instance and make a recommendation on the outcome. A party dissatisfied with the Commissioner's recommendation can seek review from the court. This decision holds that as to any issue involving legal compliance, the court will review the Commissioner's recommendation de novo. As to any issue requiring the exercise of judgment or the weighing of evidence, the court will review the Commissioner's recommendation under an abuse of discretion standard.

---

[1] Not every objector advances every objection, but for simplicity, this decision refers to the Objectors collectively.

Under the proposed procedures, the Commissioner will solicit information from each claimant, then send each claimant an initial assessment of the value of its claim. A claimant may accept that value or formally file a claim. The Objectors say this approach violates the order of operations under DUILA because they should file their claims before anything else happens. This decision holds that the Commissioner's approach does not violate DUILA and is not an abuse of the Commissioner's discretion.

The Objectors also challenge the methodology the Commissioner proposes to use when making its assessments. This decision holds that the Commissioner's methodology does not inherently constitute an abuse of discretion. This decision defers determining what methodology should apply to particular claims until the Commissioner has made recommendations where the methodology is disputed.

The Objectors complain that the proposed claims procedures do not contemplate arbitrating claims under contracts that contain mandator arbitration provisions. This decision holds that DUILA does not require the Commissioner to arbitrate a claim simply because the Company entered into a contract with an arbitration provision. Delaware's regulatory scheme takes precedence. A claimant who believes a claim should be arbitrated may ask the court to lift the antisuit injunctions barring litigation or arbitration outside of the liquidation process. The court will do so only when resolving a claim outside the liquidation process comports with DUILA and its policy goals.

The Objections also complain about access to information. They want to be able to obtain plenary discovery from the Commissioner. But the special nature of the claims proceeding does not accommodate plenary discovery. The claims procedures contain an appropriate mechanism for obtaining information from the Commissioner.

The Objectors also challenge a procedure that would allow the Commissioner to reject a claim if the Commissioner requests information and the claimant fails to provide it. That procedure is neither contrary to law nor an abuse of discretion, but the Commissioner must properly exercise discretion when applying it.

The last two objections concern the Company's reinsurers. They complain that the procedures do not comply with contractual provisions that require the Commissioner to give them notice of any claims the Company receives, followed by an opportunity to investigate the claims and interpose defenses the Commissioner has not raised. Under Delaware law, those provisions do not bind the Commissioner. Regardless, the Commissioner has committed to give reasonable notice of claims, permit the reinsures to investigate at their own expense, and allow them to raise additional defenses by objection after the Commissioner submits a recommendation to the court. That is all the reinsurers would be entitled to even if Delaware law validated the provisions at issue. The objection is therefore overruled.

The reinsurers last ask the court to modify the proposed procedures so that their contracts with the Company terminated on the same date as the Company's contracts with its ceding insurers. The Commissioner has declined to set a termination date. That decision is not contrary to law, nor is it an abuse of discretion.

3

# I. FACTUAL BACKGROUND

The facts are drawn from materials submitted in connection with various motions and objections, plus other filings on the docket.

## A. The Company

The Company is a Delaware corporation that the Commissioner licensed to sell life and health insurance. The Company was incorporated in 1977 and has its headquarters in Charlotte, North Carolina.

The Company is a wholly owned subsidiary of Scottish Holdings, Inc., also a Delaware corporation. That entity in turn is a wholly owned subsidiary of Scottish Annuity & Life Insurance Company (Cayman) Ltd. ("SALIC"), a Cayman Islands company. SALIC is a wholly owned subsidiary of Scottish Re Group Limited ("SR Parent"), also a Cayman Islands company. The Company thus served as an operating entity within a corporate group headed by SR Parent. At one point, the Company was qualified or accredited as a reinsurer in thirty-three states.

The Company operated strictly as a reinsurer. That means it did not sell insurance policies to customers, and it did not have policyholders. Instead, the Company entered into reinsurance agreements with primary insurers, who themselves sold insurance to policyholders. Under a reinsurance agreement, the reinsurer agrees to pay a portion of the losses suffered by the primary insurer on identified policies in return for a premium paid by the primary insurer. In the language of the insurance trade, the primary insurers are called cedents, because they cede a portion of the premium associated with their reinsured policies in

exchange for the reinsurer's commitment to pay the ceding insurer for a portion of its losses. The ceding primary insurer remains liable to its insureds for the losses they suffer, regardless of whether the reinsurer pays the share of the losses that it committed contractually to pay.

Coinsurance is a form of reinsurance in which the reinsurer takes on a proportionate share of all risks and cash flows associated with the ceded policies, subject to limited exceptions. The reinsurer thus receives a share of the premium paid by the insured to the primary insurer, and the reinsurer uses the premium to establish reserves for its share of the losses. Typically, the primary insurer is entitled to deduct certain fees and expenses, and the reinsurer is obligated to pay an allowance to the primary insurer for a share of the expenses involved in acquiring and maintaining the policy.

The Company sold three lines of coinsurance: Accident and Health, Annuity, and Life.

- The Accident and Health coinsurance business involved health insurance products, mostly long-term disability insurance.

- The Annuity coinsurance business involved life insurance products that pay periodic income benefits for a specified time period or over the course of the annuitant's lifetime.

- The Life coinsurance business involved traditional life insurance products.

In addition to these lines of coinsurance, the Company offered Yearly Renewable Term Reinsurance ("YRT Reinsurance"). Through that product, the Company reinsured term life policies under an arrangement where the Company assumed the risk of loss, but the primary insurer did not cede any of its reserves. Instead, the

5

ceding insurer paid the Company an annual premium that varied with the risk and ages of the insureds.

In addition to its reinsurance relationships with cedents, the Company entered into retrocession agreements with other reinsurers, known as retrocessionaires. Each retrocession agreement is a further reinsurance agreement in which the retrocessionaire acts as reinsurer and the Company acts as a cedent, referred to in this context as a retrocedent. Under a retrocession agreement, the retrocessionaire agrees to pay a portion of the losses suffered by the Company on its reinsurance obligations to the cedents. In return, the retrocessionaire receives a premium from the Company, typically calculated as a portion of the premium that the Company received from the cedent.

## B. The Company Suffers Financial Difficulties.

In 2008, the Company stopped writing new business. It notified its cedents that it would no longer accept additional reinsurance risks under its reinsurance agreements. From that point on, the Company's business consisted of fulfilling its then-existing rights and obligations under its reinsurance and retrocession agreements. In the language of the insurance trade, the Company went into run-off.

In 2018, the Company's parent companies filed for bankruptcy. SR Parent commenced voluntary winding-up proceedings in the Cayman Islands and Bermuda. Scottish Holdings and SALIC filed a jointly administered Chapter 11 proceeding in the United States Bankruptcy Court of the District of Delaware. Before those filings, the parent companies supported the Company financially, including through a

6

reinsurance agreement. With the parent companies entering bankruptcy, the Company's financial picture worsened.

Delaware law requires that an insurer file financial statements with the Commissioner. After the Company failed to file its financial statement for 2018, the Company agreed to be placed under the Commissioner's regulatory supervision.

## C.     The Rehabilitation Order

By early 2019, the Commissioner had determined that the Company was in financial distress. The principal cause was losses associated with YRT Reinsurance, together with the inability of the Company's parent entities to meet their reinsurance obligations.

On March 1, 2019, the Commissioner petitioned for a receivership to rehabilitate the Company. The Company's management and board of directors agreed that rehabilitation was in the Company's best interest. Because the Company consented, a hearing was unnecessary. By order dated March 6, 2019, this court placed the Company into receivership and appointed the Commissioner as statutory receiver for purposes of rehabilitating it.

## D.     The Liquidation Order

After extensive efforts at rehabilitation, the Commissioner moved on July 14, 2023, for an order converting the receivership into a liquidation. The Company's management and board of directors agreed that liquidation was in the best interests of the Company. Because the Company consented to the liquidation, a hearing on the motion was unnecessary. By order dated July 18, 2023, the court converted the

rehabilitation into a liquidation and confirmed the Commissioner's continuing status as statutory receiver, now for purposes of liquidating the Company (the "Liquidation Order").[2]

Among other things, the Liquidation Order imposed a series of antisuit injunctions (the "Antisuit Injunctions"). They state:

> 17. All persons and entities that have notice of these proceedings or of this Order are hereby prohibited from instituting or further prosecuting any action at law or in equity, including but not limited to any arbitration or mediation, or other proceedings against the Commissioner as Receiver, the Deputy Receiver(s), or the Designees in connection with their duties as such, or from obtaining preferences, judgments, attachments, or other like liens or encumbrances, or foreclosing upon or making any levy against SRUS or the Assets, or exercising any right adverse to the right of SRUS to or in the Assets, or in any way interfering with the Receiver, the Deputy Receiver(s), or the Designees either in their possession and control of the Assets or in the discharge of their duties hereunder.
>
> 18. All persons and entities are hereby enjoined and restrained from asserting any claim against SRUS, the Assets, the Commissioner as Receiver of SRUS, the Deputy Receiver(s), or the Designees in connection with their duties as such, except insofar as such claims are brought in the liquidation proceedings of SRUS.
>
> 19. All persons or entities that have notice of these proceedings or of this Order are hereby enjoined and restrained from asserting claims for refunds of premium resulting from the cancellation of agreements of reinsurance issued by SRUS except insofar as such claims are brought in the liquidation proceedings of SRUS.[3]

The Antisuit Injunctions remain in place.

---

[2] Dkt. 799.

[3] *Id.* ¶¶ 17–19.

8

The Liquidation Order fixed the rights and liabilities between the Company and its cedents as of September 30, 2023, and provided that any reinsurance agreements with the cedents would terminate no later than that date.[4] The Liquidation Order did not fix a termination date for reinsurance agreements with retrocessionaires.

**E.    The Motions**

On March 25 and 26, 2024, the Commissioner filed two motions. The first asked the court to approve procedures to govern how the cedents would submit reinsurance claims for amounts owed under their reinsurance agreements based on circumstances occurring on or before September 30, 2023.[5] The second asked the court to approve procedures to govern how claimants would submit other claims (the "Other Claims Procedures").[6]

Three weeks later, on April 17, 2024, the Commissioner filed a third motion. This time the Commissioner asked the court to approval a set of dispute resolution procedures (the "Dispute Procedures").[7]

Two months after that, on June 17, 2024, the Commissioner filed a fourth motion. This time the Commissioner asked the court to approve what the

---

[4] *Id.* ¶¶ 20(a), 21(b).

[5] Dkt. 847.

[6] Dkt. 846.

[7] Dkt. 853

Commissioner called final determination procedures (the "Final Determination Procedures").[8]

## F.     The Objections

The Commissioner sought—and the court granted—orders requiring interested parties to come forward with objections to the proposed procedures. There were many, resulting in a series of extensions as the Commissioner and the Objectors sought to work through their disputes. The Objectors identified the issues that were not resolved, and the Commissioner filed a consolidated reply in support of the Motions.

The parties continued to negotiate, and on October 15, 2024, the Commissioner filed an acknowledgement of the representations made in an effort to resolve or defer additional objections.[9] On October 25, 2025, the Objectors filed a statement of open issues and asked for supplemental briefing. The court granted that request.

After briefing, the Commissioner filed a letter identifying twenty-four objections still at issue. The Commissioner proposed to defer some of the objections to a later point in the proceedings. The Objectors disagreed and wanted their objections addressed now.

The Commissioner also took the position the parties had resolved certain objections, but the Commissioner did not file updated versions of the procedures. The

---

[8] Dkt. 921.

[9] Dkt. 964.

10

Objectors want the Commissioner to file updated procedures reflecting his concessions.

## II.    LEGAL ANALYSIS

The Commissioner asks the court to adopt its proposed procedures. The Objectors press at least twenty-four objections, although some overlap.

Many of the objections reflect uncertainty created by Delaware's continuing reliance on an outdated insurance statute. Under the McCarran-Ferguson Act, the reorganization or liquidation of an insurance company does not take place under the federal bankruptcy code.[10] It takes place almost entirely in state courts and as a matter of state law.[11]

Three iterations of model legislation have sought to promote consistency across jurisdictions. The first-generation statute was the Uniform Insurers Liquidation Act (the "Uniform Act"), promulgated in 1939 by the National Conference of Commissioners on Uniform State Laws ("NCCUSL") with the assistance of the American Bar Association, the National Association of Insurance Commissioners

---

[10] 15 U.S.C. § 1012(a) ("The business of insurance, and every person engaged therein, shall be subject to the laws of the several Sates which relate to the regulation or taxation of such business.").

[11] *See Cohen v. State ex rel. Stewart*, 89 A.3d 65, 72 (Del. 2014).

("NAIC"), the insurance departments of several states, and other qualified experts.[12] As many as thirty-two jurisdictions adopted the Uniform Act in some form.[13]

In 1953, Delaware adopted the Uniform Act by enacting DUILA.[14] NCCUSL withdrew the Uniform Act in 1981, citing its obsolescence.[15] Forty-four years later, Delaware continues to rely on its version of the Uniform Act, notwithstanding the Uniform Act's obsolescence.[16]

---

[12] *See Commissioner's Prefatory Note, Uniform Insurers Liquidation Act*, 9B Unif. L. Annotated 284, 286 (1966).

[13] *Lac D'Amiante du Quebec, Ltee. v. Am. Home Assurance Co.*, 864 F.2d 1033, 1039 (3d Cir. 1988).

[14] *See* 18 Del. C. § 5920 (1953) (declaring that the provisions being enacted "constitute and may be referred to as the Uniform Insurers Liquidation Act").

[15] [13 Part II] Unif. L. Annotated 126 (2002) ("The Uniform Insurers Liquidation Act (1939) was withdrawn from recommendation for enactment by the National Conference of Commissioners on Uniform States Laws in 1981 due to it being obsolete."); *see* Nat'l Ass'n of Ins. Comm'rs, *Receivers' Handbook for Insurance Company Insolvencies*, at 280 n.15 (2024) [hereinafter *Receivers' Handbook*] ("Note that the [Uniform Act] was withdrawn from recommendation for enactment by the National Conference of Commissioners on Uniform State Laws in 1981 due to it being obsolete."). At the time it was withdrawn, thirty states had insurance statutes that were substantially similar to the Uniform Act. Nat'l Conf. of Comm'rs on U.S. Laws, *Handbook of the National Conference of Commissioners on United States Laws and Proceedings of the Annual Conference Meeting in Its Eighty-Ninth Year* 481 (1982) (listing the states that had adopted the Uniform Act by 1980).

[16] Delaware is not alone. Twenty-two other states still use at least parts of the Uniform Act. *See* Nat'l Ass'n of Ins. Comm'rs, *Insurer Receivership Model Act State Page Key*, at ST-555-2 (2021), *available at* https://content.naic.org/sites/default/files/model-law-state-page-555.pdf [hereinafter *IRMA State Page Key*].

The second-generation statute is the Insurers Rehabilitation and Liquidation Model Act (the "Model Act"), promulgated in 1968 by the NAIC and based largely on the Wisconsin Insurers Liquidation Act.[17] The Model Act carried over much of the Uniform Act's terminology,[18] but made changes to clarify and improve on the predecessor statute.[19] Over thirty states plus the District of Columbia and Puerto Rico have enacted components of the Model Act.[20] Delaware has not.

---

[17] *See* Mary Cannon Veed, *Cutting the Gordian Knot: Long-Tail Claims in Insurance Insolvencies*, 34 Tort & Ins. L.J. 167, 174 (1998) (identifying the Wisconsin Insurer's Liquidation Act as the template for the Model Act); David A. Skeel, Jr., *The Law and Finance of Bank and Insurance Insolvency Regulation*, 76 Tex. L. Rev. 723, 731 (1998) (same). The NAIC amended the Model Act several times over the years. *See Receivers' Handbook, supra*, at 280.

[18] *Receivers' Handbook, supra*, at 283 ("Ten sections (54–63) of the Model Act adopt much of the [Uniform Act], as well as its policy objective: centralization of delinquency proceedings in the domiciliary jurisdiction."); *accord* Stephen W. Schwab et al., *Cross-Border Insurance Insolvencies: The Search for a Forum Concursus*, 12 U. Pa. J. Int'l. Bus. L. 303, 325 (1991) (explaining that the Model Act adopts "much of the basic terminology and procedure of the [Uniform Act], as well as the same universalist policy objective: centralization of delinquency proceedings in the domiciliary jurisdiction").

[19] *See id., supra*, at 325 ("Differences between the two statutes derive from the NAIC's efforts to clarify and improve [Uniform Act] provisions."); Eric P. Berg, Note, *Injunctions Barring Suit Against Insolvent Insurance Companies: State Cooperation Through Tit-for-Tat Strategy*, 57 Rutgers L. Rev. 1377, 1379, 1384 (2005) (describing the Model Act as "more detailed" and "more comprehensive" than the Uniform Act but as providing "a framework supporting the same policies").

[20] *See IRMA State Page Key, supra.*

The third-generation act is the Insurer Receivership Model Act ("IRMA"), promulgated in 2005 by the NAIC as an updated version of the Model Act.[21] Only two states—Texas and Utah—have adopted IRMA in its entirety.[22] Several other states have adopted parts of IRMA.[23]

There are important distinctions between the three generations of statutes.[24] Most notably for present purposes, the Model Act and IRMA contain more detailed provisions and offer more guidance for receivers, interested parties, and courts. By not updating its statute and persisting with DUILA, Delaware continues to use a gap-ridden scheme that the promulgating authority declared obsolete over four decades ago.

The lack of a current statute has consequences. When overseeing liquidation proceedings, the court must grapple all too often with questions that DUILA either does not address or fails to answer clearly. The parties and the court then must do

---

[21] *Receivers' Handbook, supra*, at 285.

[22] *IRMA State Page Key, supra*; *see* Tex. Ins. Code Ann. § 443.001; Utah Code Ann. § 31A-27a-101.

[23] *IRMA State Page Key, supra*; *see* Ariz. Rev. Stat. Ann. § 20-637; Me. Stat. tit. 24-a § 4387; Mo. Rev. Stat. § 375.1198; Nev. Rev. Stat. § 696B.280 (providing that Nevada's version of the Uniform Act "shall be so interpreted as to effectuate the general purpose to make uniform the laws of those states which enact the Uniform Insurers Liquidation Act *or the Insurer Receivership Model Act*." (emphasis added)); Tenn. Code Ann. § 56-9-338. While Delaware has generally not adopted IRMA, it has followed a several other states in adopting a version of IRMA's section on "Qualified Financial Contracts." 18 *Del. C.* § 5933.

[24] *See Receivers' Handbook, supra*, at 280–86 (providing examples).

what they have done here: search for hints in the statutory language, draw inferences from other statutory schemes, survey the law of other jurisdictions, consult articles and treatises, and consider competing public policies, all in an effort to divine a rule that a modern statute could supply.[25]

If Delaware had a current insurance statute, then those resources could be devoted to other tasks. Insurance receivership proceedings would be more efficient and predictable for everyone.

Without a current statute, it is tempting to interpret DUILA to reach the result that the Model Act or IRMA would specify. But the language of the Model Act and IRMA sometimes suggest that those statutes sought to move away from the outcome that a court applying the Uniform Act would reach or to alter an otherwise applicable common law rule. To routinely interpret DUILA to achieve the result that a modern statute contemplates would constitute judicial legislating.

It is hard to understand why Delaware would hold fast to a statutory scheme that became obsolete four decades ago, but that is the choice that the General Assembly has made. Of course, the General Assembly is busy, and insurance liquidation is not the sexiest of topics. There also may be a political economy story. The Commissioner would be the natural champion for a new statute, but an obsolete

---

[25] As part of that effort, my clerks and I have developed two tables, which this decision includes as appendices. Appendix A identifies the extent to which a state has adopted the Uniform Act, the Model Act, or IRMA. Appendix B compares DUILA with statutes in other jurisdictions. May they help litigants and jurists with future disputes under DUILA.

statute that says little imposes few constraints, giving the Commissioner wide latitude. Insurance companies would benefit from greater clarity, but operating companies would have to see value in lobbying for an updated insolvency statute. The statutory improvements would only benefit insurers who became insolvent or regularly participated in insolvencies. For a solvent company to devote resources to improving Delaware's insolvency regime could send mixed signals about its own viability or exposure, and solvent companies have better places to invest their resources. That leaves potential claimants, but guarantee associations generally cover policyholders, and contractual claimants likely face meaningful losses no matter what statute governs.

With no constituency incentivized to take action, DUILA persists. To the many who complain about long opinions, consider statutory reform.

## A.      The Standard Of Review For Adopting Liquidation Procedures

The first issue for decision is the proper standard of review for evaluating the proposed procedures. If the court uses a deferential standard, then the Commissioner will receive the benefit of the doubt. If the court uses a plenary standard, then the court will determine what the procedures will be.

In an earlier decision in this proceeding, the court observed that "[b]lack letter authorities generally state that an abuse of discretion standard applies when a court

16

reviews the decision of an insurance commissioner acting as a receiver for a delinquent insurer."[26] Treatises say similar things.[27]

To refer to delinquency proceedings in general, however, is something of an oversimplification. DUILA contemplates four types of delinquency proceedings: conservatorships, rehabilitations, reorganizations, and liquidations.[28] DUILA does not define any of these terms, but they have well understood meanings.

- In a conservatorship, also called regulatory supervision, the Commissioner takes possession of the delinquent insurer to preserve the status quo while the receiver evaluates the Company's financial status.[29]

---

[26] *In re Scot. Re (U.S.), Inc.*, 273 A.3d 277, 293 (Del. Ch. 2022).

[27] *See* 1 Couch on Ins. § 5:35 (3d ed.), Westlaw (database updated June 2025) ("The state has an important and vital interest in the liquidation of an insolvent insurance company. The only restriction on the exercise of this power is that the state's action shall be reasonably related to the public interest and shall not be arbitrary or improperly discriminatory."); *id.* § 5:37 ("The commissioner as liquidator of an insolvent insurance company is a state officer performing official duties and acts on behalf of the state, and must administer the affairs of the company for the benefit of the creditors, policyholders, and general public. In so doing, the commissioner is afforded very broad judgment and discretion in the performance of duties." (footnotes omitted)); Kristen J. Brown & Stephen Pate, *Regulatory Framework*, *in* 9 New Appleman on Insurance Law § 98.01[6] (Library ed. 2021) ("Courts reviewing receivership orders and subsequent orders implementing the receivership order most often apply an abuse of discretion standard in reviewing the insurance commissioner's actions.").

[28] 18 *Del. C.* § 5901(3) ("'Delinquency proceeding' means any proceeding commenced against an insurer pursuant to this chapter for the purpose of liquidating, rehabilitating, reorganizing or conserving such insurer.").

[29] *See* Stephen W. Schwab et al., *Onset of an Offset Revolution: The Application of Set-Offs in Insurance Insolvencies*, 95 Dick. L. Rev. 449, 451 n.3 (1991) [hereinafter *Offset Revolution*]; *see* Couch on Ins., *supra*, § 5:18 ("A conservatorship proceeding contemplates, not the liquidation of the company involved, but a conservation of the

- In a rehabilitation, the Commissioner seeks to remedy the problems that led to the delinquency proceeding so as to preserve the business of the delinquent insurer and allow it to emerge from receivership as a going concern.[30]

---

assets and business of the company over the period of stress by the commissioner who thereafter yields the control and direction to the regular officers of the company." (citing *Pac. Rim Mech. Contrs., Inc. v. Aon Risk Ins. Servs. W., Inc.*, 138 Cal. Rptr. 3d 294 (Cal. Ct. App. 2012)); *Receivers' Handbook, supra*, at 12 ("An order of conservation is designed to give the regulator an opportunity to determine the course of action that should be taken with respect to the troubled insurer."); Patrick H. Cantilo et al., *Purposes of Rehabilitation and Distinguishing It from Other Proceedings*, *in* New Appleman on Insurance Law, *supra*, § 100.01[4] ("The conservator aims to effectively run the company and resolve the insurer's impairments, followed by a rehabilitation if conservatorship proves unsuccessful, and then liquidation if rehabilitation efforts fail.").

[30] In the language of the statue, the Commissioner is charged with taking steps "toward removal of the causes and conditions which have made rehabilitation necessary." 18 *Del. C.* § 5910(a). *See generally* Howard M. Berg, *Fundamentals of Insurance Insolvency Laws*, [38 No. 7] Prac. Law. 45, 47 (1992) ("In rehabilitation the aim is to restructure the insurer to make it a viable business entity. The rehabilitator's primary purpose is to determine whether the company is in a condition that makes rehabilitating or reorganizing the insurer a reality."); *Receivers' Handbook, supra*, at 12 ("Rehabilitation can be used as a mechanism to remedy an insurer's problems, to run off its liabilities to avoid liquidation, or to prepare the insurer for liquidation."); *id.* at 586 ("Rehabilitation is the most stringent resolution proceeding short of Liquidation. Rehabilitation is designed to generate a Rehabilitation plan that will either correct the difficulties that led to the insurer being placed in receivership and restore the company's financial condition to sound basis or transition the company's policyholder liabilities to financially sound insurers. The Rehabilitator may determine the company cannot be rehabilitated. If that is the determination, then a petition for Liquidation will be filed with the court."); *Offset Revolution, supra*, at 451 n.3 ("'Rehabilitation' has been defined as the 'preservation, whenever possible, of the business of an insurance company threatened with insolvency.'" (quoting *People ex rel. Schact v. Main Ins. Co.*, 448 N.E.2d 950, 952 (Ill. App. Div. 1983))); Francine Semaya & William K. Broudy, *A Primer on Insurance Receiverships*, 40 Brief 22, 28 (2010) ("The rehabilitator manages the insurer's affairs for an indefinite time period, until the company can be returned to its prior management, or perhaps new management, or it is placed in liquidation. The primary purpose of rehabilitation is the preservation of the insurer." (footnotes omitted));

- In a reorganization, the Commissioner proceeds in a manner similar to a rehabilitation, but with the additional connotation of a material restructuring of the delinquent insurer, such as a change in its lines of business or capital structure.[31]

- In a liquidation, the Commissioner winds up the business of the delinquent insurer, marshals its assets, and makes payments to its claimants, including a liquidating distribution to equity holders, if sufficient funds are available. The delinquent insurer does not continue as a going concern.[32]

---

Skeel, *supra*, at 732 ("As the names suggest, rehabilitation proceedings are designed to stabilize and rehabilitate a troubled insurer . . . .").

[31] *Compare* 18 *Del. C.* §§ 5901(2)–(3), 5902(d) *with* 11 U.S.C. §§ 1121–1129 (discussing reorganizations under the Bankruptcy Code). The term is also used in corporate law, where it can likewise cover a lot of ground and is ultimately ambiguous. *See, e.g.*, *Stream TV Networks, Inc. v. SeeCubic, Inc.*, 279 A.3d 323, 346–47 (Del. 2022) (discussing sales of corporate assets under 8 *Del. C.* § 271 "made for the purpose of reorganization and continuance of the business in another corporation rather than for the purpose of liquidation" (quoting Henry Winthrop Ballantine, *Ballantine on Corporations* § 282, at 668 (1946))); *Hariton v. Arco Elecs., Inc.*, 188 A.2d 123, 125 (1963) (addressing validity of privately negotiated corporate reorganization plan). Because a rehabilitation can encompass similar territory, there does not appear to be much of a role for the separate concept to play.

[32] *See* Michael F. Aylward & Paul M. Hummer, *When Insurers Go Belly Up: Implications for Insurers, Policyholders and Guaranty Funds*, 70 Def. Couns. J. 448, 450 (2003) ("Liquidation of a domestic insurer involves taking possession of the property of an insurer, being vested by operation of law with title to all property, contracts and rights of action of the insurer, and giving notice to all creditors to present their claims."); Berg, *Fundamentals*, *supra*, at 46 ("In liquidation the commissioner takes title to the insurer's property and gathers the insurer's assets to liquidate them and pay the insurer's creditors."); *Receivers' Handbook*, *supra*, at 76 ("For the insurer in liquidation, the objectives are to identify and marshal the assets of the insurer; identify and evaluate liabilities and determine the appropriate class of each creditor in accordance with the domiciliary state's priority of distribution statute; and liquidate the insurer in a manner that minimizes the cost to policyholders, state guaranty funds, and other creditors."); *Offset Revolution*, *supra*, at 451–52 n.3 ("'Liquidation' precludes the transaction of further business by the company and results in a final distribution of its assets."); Semaya & Broudy, *supra*,

In each type of proceeding, the Commissioner must make discretionary decisions. Because conservatorships, rehabilitations, and reorganizations involve the insurer continuing to operate, the need for discretion is obvious, and many authorities explain that a court will review the Commissioner's judgments under an abuse of discretion standard.[33]

---

at 28 ("The liquidator's role is to wind up the insurer's affairs in a comprehensive and efficient manner.").

[33] *See, e.g.*, *In re Exec. Life Ins. Co.*, 38 Cal. Rptr. 2d 453, 460 (Cal. Ct. App. 1995) (reviewing challenge to approval of rehabilitation plan and noting that "[t]he trial court reviews the Commissioner's actions under the abuse of discretion standard"); *Ky. Cent. Life Ins. Co. v. Stephens*, 897 S.W.2d 583, 588 (Ky. 1995) ("The trial court's primary role is a supervisory one and the standard of the court's review of the rehabilitator's actions is one of abuse of discretion. Under the special statutory proceedings, the Commissioner is granted administrative discretion in the context of the insolvency/delinquency proceedings and the burden of proof is upon those contesting the Commissioner's actions."); *Mills v. Fla. Asset Fin. Corp.*, 818 N.Y.S.2d 333, 334 (N.Y. App. Div. 2006) ("The courts will generally defer to the rehabilitator's business judgment and disapprove the rehabilitator's actions only when they are shown to be arbitrary, capricious or an abuse of discretion"); *Foster v. Mut. Fire, Marine & Inland Ins. Co.*, 614 A.2d 1086, 1091 (Pa. 1992) ("[T]he involvement of the judicial process is limited to the safeguarding of the plan from any potential abuse of the Rehabilitator's discretion."); *Kueckelhan v. Fed. Old Line Ins. Co. (Mut.)*, 444 P.2d 667, 674 (Wash. 1968) (reinstating an insurance commissioner as rehabilitator and noting that the commissioner is "required to follow the statutory mandates and to use reasonable discretion in the rehabilitation of a seized company, with abuses of discretion to be checked by the judiciary"); *In re Ambac Assurance Corp.*, 841 N.W.2d 482, 495 (Wis. Ct. App. 2013) ("When reviewing the circuit court's decision to approve the rehabilitation plan, we will uphold the determinations made by the rehabilitator unless the rehabilitator abused his or her discretion."); 43 Am. Jur. 2d *Insurance* § 89, Westlaw (database updated November 2025) ("Courts will generally defer to the business judgment of the rehabilitator and will disapprove the rehabilitator's actions only when they are shown to be arbitrary, capricious, or an abuse of discretion."); 44 C.J.S. *Insurance* § 271, Westlaw (database updated May 2025) ("The conduct and disposition of proceedings for the conservation or rehabilitation of an insurance company are generally subject to judicial review under a deferential standard of

A liquidation might be viewed as different because it is a more structured proceeding that involves marshalling assets and paying claims in order of priority. But that process involves many discretionary decisions. Obvious examples include how to wind down the insurer's business, what assets to sell, what claims to pursue, when and how to take those steps, and how best to protect policyholders, creditors, and the public interest.

Plus insurers differ. They pursue different business models, focus on different market niches, issue different types of policies, and capitalize themselves in different ways. To adopt a shopworn phrase, there is "no single blueprint" for liquidating an insurance company.[34] The Commissioner must exercise discretion when carrying out a liquidation, just as in other delinquency proceedings.

The need for discretion extends to the plan for conducting it, including the procedures to be followed. Non-Delaware authorities unsurprisingly contemplate that a court will review a receiver's liquidation plan for abuse of discretion.[35]

---

abuse of discretion."); Couch on Ins., *supra*, § 5:22 ("The conservator has broad discretion to structure a plan of rehabilitation.").

[34] *See Barkan v. Amsted Indus., Inc.*, 567 A.2d 1279, 1286 (Del. 1989).

[35] *See Angoff v. Holland-Am. Ins. Co. Tr.*, 937 S.W.2d 213, 217 (Mo. Ct. App. 1996) (noting that "[a] receiver has broad discretion in conducting and managing a liquidation" in review of a challenge to approval of liquidation plan'); 43 Am. Jur. 2d *Insurance* § 94, Westlaw (database updated May 2025) ("A receiver or liquidator has broad discretion in conducting and managing the liquidation of an insolvent insurance company under the supervision of the courts so long as their acts are reasonably related to the public interest and are not arbitrary or improperly discriminatory." (footnotes omitted)); 44 C.J.S. *Insurance* § 249, Westlaw (database

A deferential standard is warranted for other reasons as well. They include (i) the Commissioner's status as an elected public official charged with exercising the authority conferred by the Insurance Code and other statues, (ii) the specialized nature of the insurance industry, (iii) the complexities of regulating insurers, (iv) the expertise that the Commissioner and the Department of Insurance develop over time, (v) the fact that the Commissioner assumes operational control of the business and affairs of the delinquent insurer and must make judgment-laden decisions regarding its operations, and (vi) the fact that, in contrast to the Commissioner's direct involvement with the insolvent insurer, the court acts in an oversight role.[36]

But stating that an abuse of discretion standard applies is not the same as operationalizing it. In an earlier decision in this proceeding, the court explained what the Commissioner must do to receive deference.[37] The same principles apply here.

---

updated May 2025) (noting that the insurance commissioner "has broad discretionary and equitable powers relating to the supervision, rehabilitation, and liquidation of insurance companies, subject to judicial review only for abuse of discretion" (footnote omitted)); Couch on Ins., *supra*, § 5:37 ("The commissioner as liquidator of an insolvent insurance company is a state officer performing official duties and acts on behalf of the state, and must administer the affairs of the company for the benefit of the creditors, policyholders, and general public. In so doing, the commissioner is afforded very broad judgment and discretion in the performance of duties." (footnotes omitted)).

[36] *See Scot. Re*, 273 A.3d at 294; *see also Ambac*, 841 N.W.2d at 495 (citing similar factors in support of abuse of discretion standard).

[37] *See Scot. Re*, 273 A.3d at 295–97.

22

First, the Commissioner must make out a *prima facie* case for the requested relief. To establish a *prima facie* case, the Commissioner must identify a source of authority, articulate a rationale for the requested relief, and create a factual record that supports the proffered rationale. Once the Commissioner has made that showing, the burden shifts to the objecting party to show that (i) the Commissioner lacked authority to make the decision or that the decision does not otherwise comply with applicable law, (ii) the Commissioner's rationale does not have substantial evidentiary support, or (iii) the decision is an abuse of discretion.[38]

When evaluating the Commissioner's decision, the reviewing court will first consider whether the decision complies with positive law.[39] Positive law includes the United States Constitution, federal statutes, federal regulations, the state constitution, state statutes, state regulations, and common law. Although Delaware law traditionally treated this dimension of the analysis as part of the abuse of

---

[38] *Id.* at 297.

[39] *See Exec. Life*, 38 Cal. Rptr. 2d at 460 (noting that under the abuse of discretion standard, a court must evaluate whether the decision "is "contrary to specific statute"); *Callon Petroleum Co. v. Superintendent of Ins. of State*, 863 N.Y.S.2d 92, 94 (N.Y. App. Div. 2008) (reversing decision of insurance commissioner under abuse of discretion statute where commissioner failed to comply with statutory requirement); *In re Frontier Ins. Co.*, 945 N.Y.S.2d 866, 870 (N.Y. Sup. Ct. 2012) (evaluating "the threshold question" of whether insurance commissioner's decision regarding classification of claims violated a state statute); *Old Line*, 444 P.2d at 675 (reversing trial court's rejection of plan where there was "nothing arbitrary, capricious, unreasonable *or unlawful* with the approach adopted by the [c]ommissioner" (emphasis added)); *Ambac*, 841 N.W.2d at 494 (analyzing whether commissioner actions were "arbitrary, capricious or an abuse of discretion" (quoting *Mills*, 818 N.Y.S.2d at 334)).

discretion standard, the precedents make clear that the court does not defer to the Commissioner's legal interpretation. Making that determination is "the responsibility of the courts."[40] Rather than rolling this step into the abuse of discretion standard itself, it makes sense to treat it as a threshold inquiry.

The next step in the analysis is to examine the Commissioner's rationale to determine whether it has substantial support in the record that the Commissioner submitted.[41] The court must consider the reasons the Commissioner identified and the record the Commissioner created to support those reasons. The court looks only for the existence of reasons, the existence of a supporting record, and the presence of substantial evidence to support the commissioner's reasons.[42] A lack of reasons, a

---

[40] *Pub. Water Supply Co. v. DiPasquale*, 735 A.2d 378, 382 (Del. 1999). That said, a court "may accord due weight, but not defer, to an agency interpretation of a statue administered by it." *Id.* (footnote omitted). A court also may give appropriate deference to an agency's interpretation of its own rules or regulations. *Id.* What a court applying Delaware law cannot do is defer to the agency's interpretation "merely because it is rational or not clearly erroneous." *Id.* at 383.

[41] *See Exec. Life*, 38 Cal. Rptr. 2d at 460 (noting that under the abuse of discretion standard, a court asks "was the action arbitrary, i.e. unsupported by a rational basis"); *Foster*, 614 A.2d at 1092 (noting that the process of review includes "determining . . . whether sufficient competent evidence exists to support the exercise of discretion"); *Koken v. Fid. Mut. Life Ins. Co.*, 803 A.2d 807, 812 (Pa. Commw. Ct. 2002) (noting that an administrative agency "abuses its discretion when its findings of fact are not supported by substantial evidence" (internal quotation marks omitted)); *Old Line*, 444 P.2d at 675 (reversing trial court's rejection of plan where commissioner provided expert testimony to support it); *Ambac*, 841 N.W.2d at 497 (affirming trial court's approval of insurance commissioner's decision where trial court received testimony which "established that the commissioner appropriately exercised its discretion").

[42] *See Scot. Re*, 273 A.3d at 297.

lack of substantial evidence to support those reasons, or the absence of any relationship between the two indicates an ill-considered, unsupported decision that is arbitrary and capricious.[43]

If the Commissioner has provided a rationale that has substantial evidentiary support, then the court defers to the Commissioner's judgment. At that stage, "it is not the function of the courts to reassess the determinations of fact and public policy made by the [Commissioner]."[44] At that point in the process, the objecting party bears the burden of showing arbitrary conduct, such as a scenario where the Commissioner's evidence or rationale plainly and obviously conflict with the Commissioner's decision.[45]

The court will apply this standard when evaluating the Commissioner's proposed procedures.

## B.    The Standard Of Review For Claim Recommendations

The next question is what standard of review the court should apply to the Commissioner's claim recommendations. The proposed Final Determination

---

[43] *See id.*; *cf. Tate v. Miles*, 503 A.2d 187, 191 (Del. 1986) (using similar approach when reviewing zoning decision).

[44] *Foster*, 614 A.2d at 1091; *see Mills*, 818 N.Y.S.2d at 334 (noting that courts will "disapprove the rehabilitator's actions only when they are shown to be arbitrary, capricious or an abuse of discretion"); *Old Line*, 444 P.2d at 675 (reversing trial court's rejection of plan where there was "nothing arbitrary, capricious, unreasonable, or unlawful with the approach adopted by the [c]ommissioner").

[45] *See Stephens*, 897 S.W.2d at 588 ("[T]he burden of proof is upon those contesting the [c]ommissioner's actions.").

25

Procedures call for applying an abuse of discretion standard to the Commissioner's recommendations on priority class and claim value. The Objectors want the court to conduct a form of *de novo* review.

### 1. Is The Standard Of Review Question Ripe?

Several Objectors argue that the standard of review question is not yet ripe. They suggest that the question cannot be answered in the abstract because "the circumstances of each claim recommendation dispute—which is fact intensive and contract specific—are unknown."[46]

"A ripeness determination requires a common sense assessment of whether the interests of the party seeking immediate relief outweigh the concerns of the court in postponing review until the question arises in some more concrete and final form."[47] A dispute is ripe if "litigation sooner or later appears to be unavoidable" and "the material facts are static."[48] Conversely, the court may not deem a dispute ripe where "future events may obviate the need" for the court to decide the issue.[49]

Determining what standard of review will apply is a question that the court will have to answer eventually. The issue presents a pure question of law that does

---

[46] Dkt. 985, at 13.

[47] *XL Specialty Ins. Co. v. WMI Liquidating Tr.*, 93 A.3d 1208, 1217 (Del. 2014) (internal quotation marks omitted).

[48] *Id.*

[49] *Id.* at 1218.

not require further factual development. While the nuances of each claim may differ, the standard of review will not. The time to decide that issue is now.

### 2. Abuse of Discretion Or De Novo Review?

In an earlier decision in this proceeding, the court observed that "[b]lack letter authorities generally state that an abuse of discretion standard applies when a court reviews the decision of an insurance commissioner acting as a receiver for a delinquent insurer."[50] By extension, the court applied an abuse of discretion standard to a "one-off issue like the request to make the Pre-Plan Payments that is not part of a broader rehabilitation plan."[51] Similar reasoning justifies applying a deferential standard of review to a claim recommendation.

### a. Public Policy And The Commissioner's Role

As discussed above, many factors favor reviewing the Commissioner's decisions for abuse of discretion.[52] The Objectors argue that while those factors warrant a deferential standard for a rehabilitation plan, they do not support a deferential standard for a claim recommendation.[53] They say the Commissioner wears two hats when conducting a liquidation: one as an insurance regulator and another as the

---

[50] *Scot. Re*, 273 A.3d at 293.

[51] *Id.* at 294.

[52] *See* Part A, *supra; accord Scot. Re*, 273 A.3d at 294 (listing factors).

[53] *See* Dkt. 985, at 4–5, 9.

27

representative of the delinquent insurer.[54] They say when the Commission makes a claim recommendation, he acts on behalf of the delinquent insurer and as a contractual counterparty to the claimant.[55] They say that in that capacity, the Commissioner "stands in the shoes" of the delinquent insurer and "has no greater contract rights than the company would have had."[56] They conclude that the court should rule on disputes between a claimant and the Commissioner when standing in the shoes of a delinquent insurer just as it would if the claimant and the insurer were litigating the dispute outside of the claims process. In that setting, the insurer would not receive the benefit of an abuse of discretion standard for its positions. The Objectors say the Commissioner should not get that benefit either.

The Objector's two-hats analogy gets it almost right. DUILA contemplates that the Commissioner serves in two roles, and the first is as the state's chief insurance regulator. The other, however, is as the *receiver* for the delinquent insurance company.[57] And although the Commissioner generally stands in the delinquent insurer's shoes when acting as receiver,[58] "that general principle has limitations, and

---

[54] *Id.* at 4.

[55] *See id.* at 5.

[56] Dkt. 941 ¶ 4; Dkt. 985, at 4.

[57] *See* 18 *Del. C.* § 5913.

[58] *See, e.g., In re Rehab. of Manhattan Re-Ins. Co.*, 2011 WL 4553582, at *7–9 (Del. Ch. Oct. 4, 2011); *Commw. ex. rel. Sheppard v. Cent. Penn Nat'l Bank*, 375 A.2d 874, 877 (Pa. Commw. Ct. 1977); *In re Liquidation of Union Indem. Ins. Co. of N.Y.*,

28

it does not allow private parties to trump the statutory provisions and public policies of the domiciliary state, such as the public policy of centralizing proceedings in the domiciliary jurisdiction and the statutory provisions that implement that policy."[59]

Those public policy considerations apply when the Commissioner makes a claim recommendation, just as when the Commissioner designs a rehabilitation plan or proposes liquidation procedures. The same more specific factors that warrant reviewing the Commissioner's decisions under an abuse of discretion standard also continue to apply.

First, when making a recommendation on a claim, the Commissioner operates "as an elected public official charged with exercising the authority conferred by the Insurance Code and other statutes."[60] Conceiving of the Commissioner as only a counterparty ignores the public dimension of his role. Under DUILA, only the Commissioner can serve as receiver; a private party cannot.[61] When making a claim recommendation, the Commissioner acts on behalf of all of the delinquent insurer's stakeholders, including policyholders, creditors, and the public generally. The

---

674 N.E.2d 313, 320–21 ("The general rule is that a liquidator of an insurance company 'stands in the shoes' of the insolvent, gaining no greater rights than the insolvent had." (cleaned up)); *Ario v. Ingram Micro, Inc.*, 600 Pa. 305, 311 n.2 (Pa. 2009).

[59] *In re Liquidation of Freestone Ins. Co.*, 143 A.3d 1234, 1260–61 (Del. Ch. 2016).

[60] *Scot. Re*, 273 A.3d at 294; *see* 18 *Del. C.* § 5917(c).

[61] *See* 18 *Del. C.* §§ 5905, 5906, 5913.

Commissioner must also consider the precedential force of his conduct and determinations for future delinquency proceedings and the soundness of insurers operating under the auspices of Delaware law. The "characteristics of the liquidator's public-protection role" make the Commissioner more than merely a substitute for the insurer as contractual counterparty.[62] Rather than conceiving of the Commissioner's receiver role as purely public or purely private, the better view is that "the Commissioner functions in a hybrid status, part public and part private, when he or she oversees the liquidation of an insolvent insurer."[63]

Like a contractual counterparty, the Commissioner must decide whether to dispute or resolve a claim. But when making that determination, the Commissioner must weigh factors that go beyond what a private party would consider. The Commissioner must take into account Delaware's statutory priority scheme.[64] He must consider the interests of all stakeholders, including the public. And he must strive to fulfill the policy goal of the Uniform Act by seeking to achieve "the orderly, expeditious, and equitable resolution of all claims against the insolvent insurer."[65] The Commissioner's broader public policy charge favors deferential review.

---

[62] *See Taylor v. Ernst & Young, L.L.P.*, 958 N.E.2d 1203, 1211–13 (Ohio 2011).

[63] *In re Liquidation of Integrity Ins. Co.*, 754 A.2d 1177, 1186 (N.J. 2000)

[64] *See Freestone*, 143 A.3d at 1245.

[65] *Cohen*, 89 A.3d at 94; *see* Couch on Ins., *supra*, § 5:36 ("One of the purposes of the Uniform Insurers Liquidation Act (UILA) is to provide for a uniform, orderly,

Second, a deferential standard of review is warranted because the "specialized nature of the insurance industry," "the complexities of regulating insurers," and "the expertise that the Commissioner and the Department of Insurance develop over time" remain relevant during the claims process in liquidation.[66] The Commissioner and his deputies draw on their expertise when they assess and value claims. While it is true that, "in the normal course, a dispute over coverage, the amount of a covered claim or the premium due would be adjudicated by a court or arbitrator, not the insurance company,"[67] that pre-delinquency reality does not diminish the Commissioner's comparative advantage in the claims process given his specialized experience and expertise. As the *Freestone* decision recognized, "the receiver is in the best position to assess and account for all the assets and liabilities of the insurance company for the sake of its creditors and policyholders."[68] This reality warrants some degree of deference to the Commissioner's claim recommendations.

Third, the statutory structure of the claims process supports an abuse of discretion standard. Section 5917 governs the handling of claims and provides in part:

> (b) All claims filed in this State *shall be filed with the receiver*, whether domiciliary or ancillary, in this State on or before the last date for filing as specified in this chapter.

_____

and equitable method of making and processing claims against financially troubled insurers . . . .").

[66] *See Scot. Re*, 273 A.3d at 294.

[67] Dkt. 985, at 9.

[68] *Freestone*, 143 A.3d at 1248.

31

(c) Within 10 days of the receipt of any claim or within such further period as the court may fix for good cause shown, *the receiver shall report the claim to the court, specifying in such report the receiver's recommendation with respect to the action to be taken thereon.* Upon receipt of such report, the court shall fix a time for hearing the claim and shall direct that the claimant or the receiver, as the court shall specify, shall give such notice as the court shall determine to such persons as shall appear to the court to be interested therein. All such notices shall specify the time and place of the hearing and shall concisely state the amount and nature of the claim, the priorities asserted, if any, and the recommendation of the receiver with reference thereto.

(d) At the hearing, all persons interested shall be entitled to appear and the court shall enter an order allowing, allowing in part, or disallowing the claim. Any such order shall be deemed to be an appealable order.[69]

This section is one of "[m]ultiple features of the Uniform Act" that "evidence the importance of centralizing the liquidation of an insurer under the control of the chief insurance regulator in the domiciliary jurisdiction."[70]

The statutory structure "places the chief insurance regulator at the center of the Claims Process, which establishes a mechanism for filing, processing, and paying claims in accordance with a statutory prioritization scheme."[71]

Notably, the statute does not contemplate that the court will resolve the claims in the first instance. Instead, the statute envisions that the initial step is for the Commissioner to make a recommendation regarding the claim; only then does the court entertain the claim and rule on it.[72]

---

[69] 18 *Del. C.* § 5917(b)–(d) (emphasis added).

[70] *Freestone*, 143 A.3d at 1244.

[71] *Id.* at 1245.

[72] *Id.* at 1245–46.

While the statute does not specify what standard of review the court should apply to the Commissioner's recommendations, the Commissioner's central role in assessing claims and making an initial determination supports using a deferential standard.

Fourth, the nature of the determinations the Commissioner makes in the claims process supports some level of deference. When conducting a liquidation, the Commission assumes control of the business and affairs of the delinquent insurer and "must make judgment-laden decisions" to evaluate liabilities and wind up the insurer's affairs in a comprehensive and efficient manner.[73] "[I]n contrast to the Commissioner's direct involvement with the delinquent insurer, the court acts in an oversight role" in the claims process.[74] Because of the tradeoffs between discretion and accountability, a party sitting in an oversight role should generally apply some level of deference when reviewing a frontline decision maker's calls.

> [Accountability mechanisms] must be capable of correcting errors but should not be such as to destroy the genuine values of authority. Clearly, a sufficiently strict and continuous organ of [accountability] can easily amount to a denial of authority. If every decision of A is to be reviewed by B, then all we have really is a shift in the locus of authority from A to B and hence no solution to the original problem.[75]

---

[73] *Scot. Re*, 273 A.2d at 294.

[74] *Id.*

[75] Kenneth J. Arrow, *The Limits of Organization* 78 (1974).

The solution is to grant the frontline decisionmaker a zone of operations where a degree of deference prevails.[76]

Fifth, some level of deference is warranted because valuation is a judgment-laden exercise. "It is trite but true to observe that valuation is as much of art as science."[77] Valuing claims requires both the use of traditional damages concepts and the challenges of assigning values to contingent outcomes. The actual figures will be fuzzy, and the Commissioner is best positioned to make those judgments in the first instance.

Given the Commissioner's central role in the claims process and the necessity of exercising judgment, this court has previously reviewed the Commissioners' claim recommendations under an abuse of discretion standard. Throughout the *Indemnity Insurance* liquidation, the court applied that standard of review.[78] The Objectors

---

[76] *See generally* Stephen M. Bainbridge, *Director Primacy in Corporate Takeovers: Preliminary Reflections*, 55 Stan. L. Rev. 791, 806–07, 815 (2002) (using Arrow's theory to explain importance of courts applying deferential review to board decisions).

[77] *In re Scot. Re*, 274 A.3d 1019, 1024 n.1 (Del. Ch. 2022).

[78] *See In re Indem. Ins. Corp., RRG*, 2023 WL 646709, at *1 & n.6 (Del. Ch. Jan. 25, 2023) (ORDER) (citing *Scot. Re*, 273 A.3d at 293); *In re Indem. Ins. Corp. RRG*, 2023 WL 2914201, at *1 (Del. Ch. Apr. 11, 2023) (ORDER) (same); *In re Indem. Ins. Corp. RRG*, 2023 WL 4761820, at *1 (Del. Ch. July 25, 2023) (ORDER) (same); *In re Indem. Ins. Corp. RRG*, 2023 WL 8084341, at *1 (Del. Ch. Nov. 20, 2023) (ORDER) (same); *In re Indem. Ins. Corp., RRG*, 2024 WL 838687, at *1 (Del. Ch. Feb. 27, 2024) (ORDER) (same); *In re Indem. Ins. Corp., RRG*, 2024 WL 4371722, at *1 (Del. Ch. Oct. 1, 2024) (ORDER) (same); *In re Indem. Ins. Corp., RRG*, 2024 WL 4680427, at *1 (Del. Ch. Nov. 4, 2024) (ORDER) (same).

argue that the *Indemnity Insurance* orders are distinguishable because the claimants there were policyholders, not sophisticated insurance companies, but that makes no difference. The same statutory, policy, and efficiency considerations apply. Those considerations also distinguish an insurance liquidation from a standard court-ordered receivership, where the court appoints a private individual as receiver and a default rule of *de novo* review applies.[79]

### b. The Textual Arguments

In the face of powerful justifications for deferential review, the Objectors make two textual arguments for *de novo* review. Neither is persuasive.

First, the Objectors argue that DUILA "uses broad, discretionary language to describe the Receiver's role" when the statute intends a deferential standard of review.[80] As an example, they point to Section 5910, titled "Order of rehabilitation, termination." Subsection (a) states:

> An order to rehabilitate a domestic insurer shall direct the Commissioner forthwith to take possession of the property of the insurer and to conduct the business thereof and to take such steps toward removal of the causes and conditions which have made rehabilitation necessary as the court may direct.[81]

---

[79] *See In re Dissolution of Jeffco Mgmt., LLC*, 2021 WL 3611788, at *5 (Del. Ch. Aug. 16, 2021).

[80] Dkt. 985, at 6.

[81] 18 *Del. C.* § 5910(a).

Turning to Section 5917, titled "Form of claim; notice; hearing," they stress the absence of similarly broad language. The Objectors assert that Section 5917 governs claims processes in liquidations, and they argue that if broad language in Section 5910(a) supports deferential review for rehabilitations, the absence of broad language in Section 5917 should call for plenary review in claims processes.

Contrary to the Objectors' assertion, Section 5917 is not liquidation-specific. It applies to claims in all types of delinquency proceedings.[82] The better comparison is to Section 5911, titled "Order of liquidation; domestic insurers; solvent insurer's assets." It states:

> An order to liquidate the business of a domestic insurer shall direct the Commissioner forthwith to *take possession of the property of the insurer, to liquidate its business, to deal with the insurer's property and business* in the Commissioner's own name as Insurance Commissioner or in the name of the insurer, as the court may direct, and to give notice to all creditors who may have claims against the insurer to present such claims.[83]

That language is just as broad as the rehabilitation order language in Section 5910.

The Objectors have drawn a false distinction between statutory sections. Just as the breadth of Section 5910 warrants discretionary review in rehabilitations, so too does the breadth of Section 5911 warrant discretionary review in liquidations.

Second, the Objectors point language in Section 5917 stating that "the receiver shall *report* the claim to the court, specifying in such report the receiver's

---

[82] 18 *Del. C.* § 5917(a).

[83] 18 *Del. C.* § 5911(a) (emphasis added).

*recommendation* with respect to the action to be taken thereon."[84] Seizing on the terms "report" and "recommendation," the Objectors draw analogies to a magistrate in Chancery's "report" and a federal magistrate judge's "report and recommendation." The Objectors argue that because a member of this court applies *de novo* review when reviewing exceptions to a magistrate's report and recommendation under *DiGiacobbe v. Sestak*,[85] this court must apply *de novo* review when reviewing the Commissioner's report and recommendation with respect to a claim.

Despite the use of similar words, the analogy is flawed. A magistrate lacks an independent source of authority. As the *DiGiacobbe* court explained, "[t]he Delaware Constitution restricts the exercise of judicial authority to those who are appointed by the Governor and confirmed by the Senate. Since [magistrates] in the Court of Chancery are appointed by the Chancellor, they may not exercise judicial authority."[86] A magistrate's authority flows from the judicial officer that appoints the individual to that position, be that the Chancellor for Magistrates in Chancery or any of the court's constitutional judicial officers for special magistrates. Because the magistrate's authority flows from the appointing judicial officer, the magistrate's

---

[84] 18 *Del. C.* § 5917(c) (emphasis added).

[85] 743 A.2d 180 (Del. 1999).

[86] *Id.* at 182–83.

rulings have no effect (at least without party consent) until subjected to *de novo* review by a constitutional judge.[87]

The Commissioner, by contrast, has independent sources of authority. By statute, the Commissioner "shall be elected by the qualified electors of the State at a general election for a term of 4 years and shall be commissioned by the Governor."[88] The statute empowers the Commissioner to act as "the chief officer of the Insurance Department"[89] and to regulate a specialized industry.[90] DUILA designates the Commissioner as the only person who can serve as the receiver in a delinquency proceeding.[91] Because the Commissioner can draw on independent sources of authority, the analogy to a magistrate fails.

Neither of the Objector's textual arguments calls for applying a *de novo* standard of review. If anything, the central role that DUILA affords the Commissioner supports deferential review.

---

[87] *Id.* at 184.

[88] 18 Del. C. § 301(b).

[89] *Id.* § 301(a).

[90] *See, e.g., id.* § 310 (identifying general powers and duties of Commissioner); *id.* § 311 (empowering Commissioner to adopt rules and regulations); *id.* § 312 (empowering commissioner to issue orders).

[91] *See id.* § 5913.

### c.     Decisions From Other Jurisdictions

As its name implies, DUILA is a uniform act that "shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states that enact it."[92] Accordingly, "cases from other jurisdictions provide persuasive guidance."[93] State courts in California and Washington have held that a deferential standard of review applies to an insurance commissioner's claim recommendation. Alaska state courts apply *de novo* review. While the insurance codes in those states are not identical to Delaware's, each statutory scheme draws on the Uniform Act, so its precedent warrants consideration.[94]

### i.     California

California applies an abuse of discretion standard, having confronted the issue during liquidation proceedings involving Golden Eagle Insurance Corporation. Several decisions from those proceedings addressed the standard of review.

Golden Eagle's rehabilitation plan included a claims procedure that contemplated the California Commissioner reviewing claims and making a determination.[95] By statute, if the commissioner rejected a claim, then "the claimant

---

[92] *Id.* § 5920(b).

[93] *Cohen*, 89 A.2d at 96.

[94] *See* Cal. Ins. Code § 1064.12; Wash. Rev. Code § 48.99.010; Alaska Stat. § 21.78.200.

[95] *Garamendi v. Golden Eagle Ins. Co.*, 27 Cal. Rptr. 3d 239, 244–45 (Cal. Ct. App. 2005).

may apply to the court in which the liquidation proceeding is pending for an order to show cause why the claim should not be allowed."[96] Former employees asserted employment-related claims against Golden Eagle, and the commissioner rejected them as "without legal or factual merit."[97] The trial court affirmed the ruling as not constituting an abuse of discretion, and the intermediate appellate court affirmed the trial court's ruling on appeal.[98] The court noted that the California Insurance Code "vests the commissioner with the responsibility for acting both as receiver or trustee for the troubled insurer" and empowered the commissioner to handle the claims process.[99] The statute did not specify procedures for the commissioner to use when evaluating claims, and a general expectation existed that "an informal process is adequate."[100] The court concluded that when a trial court reviews a claim determination, then the trial court "must affirm the actions of the commissioner as a conservator unless they constitute an abuse of discretion."[101] As support, the court cited an earlier decision involving Golden Eagle, where the California Commissioner had rejected a claim, despite the claimants' possession of a default judgment in their

---

[96] *Id.* at 248 (citing Cal. Ins. Code. § 1032).

[97] *Id.* at 245.

[98] *Id.* at 243.

[99] *Id.* at 248–49 (internal quotation marks omitted).

[100] *Id.* at 249.

[101] *Id.*

favor, and the trial court affirmed the decision under an abuse of discretion standard.[102]

The appellate court emphasized that the abuse of discretion standard was not a blank check for the California Commissioner to act without restraint. The court explained that the standard operated as follows:

> Applying the abuse of discretion standard, a trial judge is required to affirm the commissioner's rejection of a claim unless:
>
> (1) the commissioner did not fulfill his obligation to provide "a full and fair determination" of the claim by, for example, failing to "conduct a thorough investigation of the claim" . . . ;
>
> (2) the commissioner's decision to reject the claim was not supported by substantial evidence . . . ; or
>
> (3) the commissioner applied an improper legal standard or otherwise based the determination on an error of law.[103]

The court held that the trial court properly applied that standard when affirming the California Commissioner's rejection of the claims.[104]

The Golden Eagle delinquency proceeding later transitioned into a liquidation. During that phase, an attorney who represented an insured in a covered dispute filed a claim against Golden Eagle for attorneys' fees under the policy, and the California Commission rejected the claim as untimely. The trial court affirmed the

---

[102] *Low v. Golden Eagle Ins. Co.*, 125 Cal. Rptr. 2d 155, 167 (Cal. Ct. App. 2002).

[103] *Garamendi*, 27 Cal. Rptr. 3d at 250 (citations omitted; formatting modified).

[104] *Id.* at 262.

determination, and the claimant appealed. California's intermediate appellate court

held that the abuse of discretion standard continued to apply, stating:

> The standard of review in this type of proceeding has been set out in prior appellate decisions involving Golden Eagle's conservation/liquidation: "In these special proceedings for an insurer in conservation, the actions of the Commissioner are subject to judicial review, but not de novo review. The trial court reviews them under an abuse of discretion standard, asking if the action was arbitrary, i.e., unsupported by a rational basis, contrary to specific statute or discriminatory."[105]

On the timeliness issue, the appellate court affirmed the trial court's adoption of the

California Commissioner's determination finding that "the court acted within its

discretion in denying Leaf's application for an order to show cause."[106]

### ii. Washington

Washington applies an abuse of discretion standard, having confronted the

standard of review question in proceedings involving Cascade National Insurance

Company.[107] On behalf of a bankrupt debtor, a bankruptcy trustee filed a claim in the

liquidation seeking to recovery $4.3 million in allegedly fraudulent transfers.[108] The

---

[105] *See Ins. Comm'r of the State of Cal. v. Golden Eagle Ins. Co.*, 2013 WL 5779825, at *3 (quoting *Low v. Golden Eagle Ins. Co.*, 2 Cal. Rptr. 3d 761, 770 (Cal. Ct. App. 2003)). Rule 8.1115 of the California Rules of Court restricts citations to unpublished opinions in California courts. This is not a California court, and this Court does not have a similar rule. *See* Ct. Ch. R. 7(e).

[106] *Golden Eagle*, 2013 WL 5779825, at *6.

[107] *See Kreidler v. Cascade Nat. Ins. Co.*, 321 P.3d 281, 287 (Wash. Ct. App. 2014).

[108] *Id.* at 285.

Washington Commissioner, acting as receiver, denied the claim for lack of factual support. The bankruptcy trustee sought an order from the trial court compelling the Commissioner to produce discovery, but the Commissioner provided the materials voluntarily. The Commissioner again denied the claim and petitioned the superior court to confirm the determination. Applying an abuse of discretion standard, the trial court affirmed the determination.

The trustee appealed, and the intermediate appellate court affirmed the trial court's decision. The court explained that "[i]n an insurance receivership action, the trial court reviews the Receiver's determinations under an abuse of discretion standard."[109] Writing in 2014, the court drew that standard from *Old Line*, a 1968 decision from the Washington Supreme Court.[110] In *Old Line*, the justices explained the rationale for the abuse of discretion standard as follows

> As the program of rehabilitation takes form and the steps unfold, the trial court in its supervisory and reviewing role may not substitute its judgment for that of the Commissioner, but may and should only intervene or restrain when it is made to appear that the Commissioner is manifestly abusing the authority and discretion vested in him and/or is embarking upon a capricious, untenable or unlawful course.[111]

Citing the Washington analog to DUILA Section 5910, the Washington Supreme Court reasoned that

---

[109] *Id.* at 287.

[110] *Id.* (citing *Old Line*, 444 P.2d at 674).

[111] *Old Line*, 444 P.2d at 674.

the legislature, in its wisdom, in its reliance upon the presumed expertise and experience of a duly elected and functioning state official, and in the public interest, vested the Commissioner with a realistic and effective control over the administration of the affairs and assets of an insurer found to be in need of rehabilitation. The authority so vested necessarily contemplates and embraces a considerable degree of independent administrative judgment and discretion to be exercised by the Commissioner if he is to carry out the responsibility and trust imposed upon him.[112]

*Cascade National* applied the same standard to the Washington Commissioner's claim determination and cited the California authorities from the Golden Eagle proceedings with approval.[113] Applying that standard, the *Cascade National* court affirmed the trial court decision.[114]

### iii.    Alaska

In contrast to California and Washington, Alaska courts review claim determinations *de novo*.[115] In liquidation proceedings for Pacific Marine Insurance Company of Alaska, the Great Atlantic Insurance Company submitted a claim for nearly $1.4 million in reinsurance. The Alaska insurance commissioner rejected the claim as untimely, and the trial court upheld the decision under a deferential

---

[112] *Id.* at 673.

[113] *Cascade Nat.*, 321 P.3d at 287.

[114] *Id.* at 291.

[115] *See Williams v. Wainscott*, 974 P.2d 975, 978–79 (Alaska 1999).

standard of review. The Alaska Supreme Court reversed, holding that *de novo* review was required.[116]

In reaching that conclusion, the Alaska Supreme Court started from the premise that a court applies a deferential standard of review when examining an agency determination where the agency has conducted a hearing. The delinquency statute, by contrast, did not require that the receiver conduct a hearing.[117] The justices also found it significant that the statute vested the superior court with "exclusive original jurisdiction of delinquency proceedings," rather than "appellate jurisdiction."[118] The justices concluded that the receivers role resembled "that of a personal representative in probate proceedings," where the personal representative marshalled the assets of the estate and could "allow or disallow a properly presented claim," but a claimant whose claim was disallowed could sue the personal representative and obtain "a de novo hearing including, if requested, a jury trial."[119] The court reversed the trial court's decision and remanded so that the court could conduct a *de novo* review.[120]

### iv.    Evaluating The Precedent

---

[116] *Id.* at 976.

[117] *Id.* at 978.

[118] *Id.* at 979.

[119] *Id.*

[120] *Id.* at 983.

With only three jurisdictions having addressed the standard of review applicable to claim recommendations, a clear majority rule has not yet emerged. California and Washington together nose out Alaska, but the narrow margin is hardly persuasive on its own.

Instead, California and Washington offer the more persuasive precedent because the reasoning in those decisions more closely resembles how Delaware courts have approached the Commissioner's authority. Those decisions take into account the insurance commissioner's independent authority, expertise, and central role in receivership proceedings.

The Alaska decision, by contrast, analogizes the commissioner to a personal representative, treating the commissioner as if she were simply a private citizen handling a will dispute. The Alaska decision also relies heavily on the grant of original jurisdiction to the trial court, but a grant of jurisdiction does not imply a standard of review. When considering DUILA's comparable grant of original jurisdiction to the Court of Chancery, this court noted that that "the statute does not contemplate that the court will resolve the claims in the first instance [and instead] envisions that the initial step is for the Commissioner to make a recommendation regarding the claim; only then does the court entertain the claim and rule on it."[121] The Alaska decision does not give any weight to the potential for *de novo* review to

---

[121] *Freestone*, 143 A.3d at 1246.

46

undermine the insurance commissioner's authority or interfere with the efficient resolution of claims.

The California and Washington courts' perspectives align more closely with how Delaware approaches receivership proceedings. Their authorities addressing the standard of review are therefore more persuasive.

### d. Summarizing the Standard

The court will review the Commissioner's claim recommendations for abuse of discretion. The Commissioner to must articulate a rationale for its determination and provide sufficient evidence to support that rationale. Once the Commissioner has made that showing, the burden shifts to the claimant to show that the Commissioner has abused his discretion.

## C. Objections To The Other Claims Procedures

The next group of issues involves cedents' objections to the Other Claims Procedures and their use for handling cedents' breach of contract claims arising from the termination of their contracts with the Company under the Liquidation Order ("Cedent Termination Claims"). The Objectors argue that the proposed procedures violate DUILA because they contemplate that the Commissioner will provide a valuation of the Cedent Termination Claims up front, before any cedent files a claim.[122] That objection is not well-taken.

The Other Claims Procedures contemplate the following process:

---

[122] *See* Dkt. 909 ¶¶ 8–9.

- First, any cedent seeking to assert a Cedent Termination Claim must submit to the Commissioner a "listing of the in-force policies covered under each treaty ceded to SRUS as of 9/30/2023" along with affidavit of completeness and accuracy.[123]

- Second, the Commissioner calculates the present value of future losses under each terminated agreement using the Commissioner's valuation methodology and assumptions, then sends each claimant a proof of claim form identifying the claim valuation.[124]

- Third, a cedent can either accept or dispute the Commissioner's valuation. If the cedent disputes the valuation, then the cedent can submit its own valuation to the Commissioner along with backup supporting the alternative valuation.[125]

- Fourth, the Commissioner evaluates the cedent's valuation. The Commissioner may request additional information from the claimant and may work with the claimant to resolve the dispute.[126]

- Finally, the Commissioner issues a report on all claims and submits its recommendations to the court.[127]

The Objectors argue that the first two steps in this process violate DUILA.

According to the Objectors, the first two steps violate DUILA because Section 5917 does not contemplate the Commissioner preparing an initial valuation. That section has four subsections. The first describes what a claim must contain and states:

> All claims against [the delinquent insurer] shall set forth in reasonable detail the amount of the claim or the basis upon which such amount can

---

[123] Dkt. 846, at Ex. 1 § 3.2.1.1.

[124] *Id.* §§ 3.2.1.2–3.2.1.4.

[125] *Id.* §§ 3.2.1.5–3.2.1.8; Dkt. 1024, at Ex. 1.

[126] *Id.* §§ 3.2.3.1–3.2.3.3.

[127] *Id.* §§ 3.2.1.5, 3.2.3.2–3.2.3.3; *see generally* Dkt. 853, at Ex. 1 (Dispute Procedures); Dkt. 921, at Ex. 1 (Final Determination Procedures).

be ascertained, the facts upon which the claim is based and the priorities asserted, if any. All such claims shall be verified by the affidavit of the claimant or someone authorized to act on the claimant's behalf and having knowledge of the facts and shall be supported by such documents as may be material thereto.[128]

That section does not address the sequencing of the claims process or foreclose preliminary steps, such as an initial valuation by the Commissioner.

The other subsections do not foreclose preliminary steps either. Section 5917(b) states that "[a]ll claims filed in this State shall be filed with the receiver, whether domiciliary or ancillary, in this State on or before the last date for filing as specified in this chapter."[129] It imposes a deadline for claims. It does not limit what happens before the deadline.

Section 5917(c) also sets s deadline, this time on the Commissioner. It states that "[w]ithin 10 days of the receipt of any claim or within such further period as the court may fix for good cause shown, the receiver shall report the claim to the court . . . ."[130] That section also provides that "[u]pon receipt of such report, the court shall fix a time for hearing the claim and shall direct that the claimant or the receiver, as the court shall specify, shall give such notice as the court shall determine to such persons as shall appear to the court to be interested therein."[131] It concludes by

---

[128] 18 *Del. C.* § 5917(a).

[129] *Id.* § 5917(b).

[130] *Id.* § 5917(c).

[131] *Id.*

stating that "[a]ll such notices shall specify the time and place of the hearing and shall concisely state the amount and nature of the claim, the priorities asserted, if any, and the recommendation of the receiver with reference thereto."[132] None of those provisions limit pre-claim procedures either.

Last, Section 5917(d) states: "At the hearing, all persons interested shall be entitled to appear and the court shall enter an order allowing, allowing in part, or disallowing the claim. Any such order shall be deemed to be an appealable order."[133] That section also does not limit pre-claim procedures.

The Commissioner's proposal to provide an initial estimate of claim values to does not conflict any aspect of Section 5917. No one suggests that the Commissioner could not engages in pre-claim discussions with potential claimants, exchange informal estimates, or reach settlements. There is no reason to prevent the Commissioner from formalizing an aspect of what could be an informal process.

The Commissioner's proposal is also one this court approved previously. In the liquidation of Indemnity Insurance Corporation, the court authorized a similar process.[134] Admittedly, the issue was not contested, but it also does not appear to have resulted in any hardship. Outside of Delaware, courts in three states that apply

---

[132] *Id.*

[133] *Id.* § 5917(d)

[134] *See In re Liquidation of Indem. Ins. Corp., RRG*, 2018 WL 6431747, at *6 (Del. Ch. Dec. 6, 2018) (citing 18 *Del. C.* § 5917).

50

versions of the Uniform Act have allowed commissioners to address claims using procedures that departed from the Objectors' "claim first" structure.[135]

Because the Commissioner's proposal does not violate DUILA, the issue becomes whether the Commissioner has abused his discretion. The Commissioner's stated rationale for the proposal is "to expedite the resolution of claims and to identify and resolve disputed issues,"[136] consistent with DUILA's goal of promoting the "orderly, expeditious, and equitable resolution of all claims against the insolvent insurer."[137] The Commissioner believes that a standardized process for the initial valuation of Cedent Termination Claims will help identify and resolve undisputed claims expeditiously and to move disputed claims through the dispute resolution

---

[135] *See State v. Arizona Pension Planning*, 739 P.2d 1373, 1378 (Ariz. 1987) (permitting commissioner to consolidate claims and pursue them on behalf of the insureds); *In re Liquidation of Integrity Ins. Co.*, 691 A.2d 898, 906 (N.J. Super. Ct. Ch. Div. 1996) (permitting commissioner to verify claims on behalf of contingent claimants); *State ex rel. Crawford v. Indem. Underwriters Ins. Co.*, 943 P.2d 167, 170 (Okla. Civ. App. 1997) (permitting claims allowance procedures that required claimants to provide a "written statement of material facts" with their objection *after* the receiver's claim recommendation and to make reference to "the supporting documentation which the objecting party submitted to the Receiver with a proof of claim"). Later New Jersey decisions reversed the trial court's decision to allow contingent claims to receive a distribution. *See In re Liquidation of Integrity Ins. Co.*, 935 A.2d 1184 (N.J. 2007); *see also* Veed, *supra*, at 182–84 (discussing trial court decision's conflict with statute). The later decisions did not disturb the trial court's ruling that the commissioner could present claims. *See Integrity*, 935 A.2d at 1190 n.2 (distinguishing treatment of contingent claims at proof of claim stage from treatment at distribution stage).

[136] Dkt. 956, at 8.

[137] *Cohen*, 89 A.3d at 94.

51

process efficiently.[138] As factual support, the Commissioner suppled affiliates from the Deputy Receiver with responsibility for the Company and the Senior Actuarial Executive in liquidation.[139]

The Commissioner has thus provided a coherent rationale and sufficient evidentiary support. The burden therefore shifts to the Objectors to show that the Commissioner's proposal constitutes an abuse of his discretion.

The Objectors have not carried that burden. There may be scenarios where claimants agree with or have not reason to dispute the Commissioner's initial valuation of their Cedent Termination Claims. There is no apparent prejudice from the Commissioner's proposed procedure. Claimants still have the opportunity to decide whether to assert a Cedent Termination Claim and to present their own valuation. Claimants remain free to use a different valuation methodology. This process reflects a proper exercise of the Commissioner's discretion.

## D.    Objections To The Valuation Methodology

The Objectors next contest the valuation methodology that the Commissioner's intends to use for Cedent Termination Claims. This objection likewise fails.

The Commissioner contemplates calculating the present value of future losses using a Gross Premium Reserve Valuation ("GPV") model. Generally speaking, this approach calculates a present value of the future payments cedents could expect

---

[138] *See* Dkt. 956, at 6–7.

[139] *See* Dkt. 846, at Ex. 2; *id.* at Ex. 3.

under their agreements, less any offsets such as the premium owed.[140] The Commissioner supported the GPV methodology with a memorandum prepared by the Senior Actuarial Executive for the Company's Liquidation Estate.[141]

After the Objectors challenged the GPV methodology, they engaged in dialogue with the Commissioner. One sticking point was whether the Commissioner would disclose the model's mortality assumptions. The Commissioner represented that the model used a proprietary table from Hannover Life Reassurance Company of America, but the Commissioner did not commit to providing the underlying information. That led the Objectors to argue that the Commissioner proposed to use a "black-box mortality model that will not be disclosed and therefore cannot be evaluated."[142] The Objectors also objected that using the GPV method conflicted with the termination of their reinsurance agreements.[143]

---

[140] *See* Dkt. 1017, at 47.

[141] Dkt. 846, Ex. 3 at Ex. A.

[142] Dkt. 909 ¶ 17.

[143] *See* Dkt. 909 ¶¶ 9, 17; Dkt. 911 ¶¶ 22–24; Dkt. 915 ¶ 3; Dkt. 916 ¶ 14. Several secured creditors of the Copmany objected that the Commissioner's proposed procedures did not provide for cedents with claims secured by assets held in trust accounts to withdraw those assets to satisfy their claims. *See* Dkt. 911 ¶¶ 2, 13–21 (Integrity Life Insurance Company); Dkt. 916 ¶¶ 1, 3–21 (Ohio National Life Insurance Company); Dkt. 918 ¶ 9 (Nationwide Life Insurance Company and Nationwide Life and Annuity Insurance Company). The Commissioner responded that it had agreed to or was in the process of negotiating stipulations with all secured cedents to allow them to withdraw undisputed amounts in trust accounts. *See* Dkt. 956 at 17–19. The court has granted several of the stipulated orders, including those involving the cedents who initially raised the objections. *See* Dkt. 837; Dkt. 861; Dkt.

At this point, the Commissioner no longer seeks a ruling that the GPV method will apply to all Cedent Termination Claims. The Commissioner proposes to address the valuation methodology in connection with individual claims and believes that, in most instances, the GPV method will not conflict with any contractual term. The Commissioner also revised the Other Claims Procedures and proof of claim forms to make clear that a claimant could use other methodologies and assumptions.[144] The Commissioner also reached a deal with Hannover that will allow the Commissioner to share mortality table information.[145]

The court agrees with the Commissioner's proposal to defer any disputes over the valuation methodology until the claims process. As a general matter, however, the court can hold now that regardless of whether the GPV model may be inappropriate for a particular claim, using GPV model is not an abuse of discretion in the abstract.

Different courts have approved a variety of valuation methodologies for claims based on terminated insurance contracts. Most involve customer polices rather than reinsurance treaties, but the principles transfer. The principal valuation approaches

936; Dkt. 937 (Nationwide); Dkt. 986 (Augustar Life Insurance Company f/k/a Ohio National); Dkt. 993; Dkt. 997 (Integrity); Dkt. 999; Dkt. 1015. The Objectors did not include this objection in their list of open issues or raise the objection at oral argument. *See* Dkt. 969, at Ex. A.

[144] *See* Dkt. 956, at 8, Ex. A, Ex. B; Dkt. 1017, at 48–51; Dkt. 1024, at Ex. 1.

[145] *See* Dkt. 1001, at Ex. 1 § 2.1(e).

include (1) unearned or return premium, (2) replacement value, and (3) reserve value, defined as the present value of the difference between future benefits payable and the amount of future premiums due but for the insolvency.[146]

The GPV method is a version of the reserve value approach. Several state court decisions have upheld the use of reserve-based approaches.[147] While other valuation approaches may be viable or justifiable, the Objectors have not demonstrated that the Commissioner's selection of the GPV method as a default method constitutes an abuse of discretion.

A claimant may be able to demonstrate that using the GPV method for a particular claim would be inappropriate. For example, if the Commissioner fails to provide sufficient evidence to support its valuation for a claim, particularly if it turns out the Commissioner's approach conflicts with an applicable contractual provision, then a claimant might have a basis to challenge its use. But using the method as a default choice falls within the Commissioner's discretion.

The Commissioner must file an updated version of the Other Claims Procedures that reflect the changes to Section 3.2.1.8 and to the attached proof of

---

[146] Couch on Ins., *supra*, § 6:1; *see* Veed, *supra*, at 175–84.

[147] *See Caminetti v. Manierre*, 142 P.2d 741, 746–49 (Cal. 1943); *Exec. Life*, 38 Cal. Rptr. 2d at 460, 476–77; *Comm'r of Ins. v. Mass. Acc. Co.*, 50 N.E.2d 801, 808 (Mass. 1943). A later Massachusetts case declined to extend *Massachusetts Accident* in the context property and casualty insurance policy and rejected the reinsurers' attempt to offset their liability with case reserves and incurred but not reported (IBNR) reserves. *In re Liquidation of Am. Mut. Liab. Ins. Co.*, 747 N.E.2d 1215, 1232 (Mass. 2001).

claim forms that the Commissioner filed.[148] The court will approve the Other Claims

Procedures with those changes.

## E.    Arbitration

The Objectors next challenge the Dispute Procedures because they only

contemplate arbitration of claim disputes by agreement of the parties.[149] Some

Objectors contend that reinsurance or retrocession agreements with the Company

contain mandatory arbitration provisions.[150] They argue that the Dispute Procedures

must allow for arbitration if an agreement with the Company would ordinarily

require arbitration. That objection is not well-taken.

The Dispute Procedures do not bar a claimant from seeking a court order

compelling arbitration. If a claimant wishes to rely on an arbitration provision and

the Commissioner does not agree, then the claimant can move to lift the Antisuit

Injunctions and compel arbitration. At present, the Antisuit Injunctions prohibit

"[a]ll persons and entities that have notice of these proceedings or of this Order . . .

from instituting or further prosecuting . . . *any arbitration* . . . against the

Commissioner as Receiver, the Deputy Receiver(s), or the Designees in connection

with their duties as such . . . ."[151] They also enjoin and restrain "[a]ll persons and

---

[148] *See* Dkt. 1024.

[149] *See* Dkt. 853, at Ex. 1 § 6.2.1.

[150] *See* Dkt. 902 ¶ 5; Dkt. 906 ¶ 3; Dkt. 908, at 3.

[151] Dkt. 799 ¶ 17 (emphasis added).

entities . . . from asserting any claim against SRUS, the Assets, the Commissioner as Receiver of SRUS, the Deputy Receiver(s), or the Designees in connection with their duties as such, except insofar as such claims are *brought in the liquidation proceedings* of SRUS."[152]

### 1. No Right To Compel Arbitration

The Objectors argue that the court must enforce mandatory arbitration provisions because the Commissioner steps into the shoes of the Company. Just as that metaphor overstates matters for purposes of determining the standard of review for claims determinations, it also overstates matters for purposes of mandatory arbitration.

As a threshold matter, the arbitration provisions are not directly enforceable against the Commissioner, because the Commissioner is not a party to the agreements.[153] The provisions also cannot "trump the statutory provisions and public policies of the domiciliary state, such as the public policy of centralizing proceedings in the domiciliary jurisdiction and the statutory provisions that implement that

---

[152] *Id.* ¶ 18 (emphasis added).

[153] *See Taylor*, 958 N.E.2d at 1211 (holding that liquidator was "not bound to arbitration agreements entered into by the insolvent insurer as if she were the signatory insurer" because liquidator "[did] not stand in the shoes as a mere successor in interest of the insolvent insurer"); *Freestone*, 143 A.3d at 1260 ("[I]n my view, even a mandatory forum selection provision would not automatically bind the Commissioner when exercising the State of Delaware's regulatory and police powers under the Uniform Act.").

policy."[154] The Objectors' argument that the court must enforce their arbitration provisions is incorrect as a matter of law.

## 2.  The *Freestone* Analysis

Although a party cannot force the Commissioner to arbitrate, the court can lift the Antisuit Injunctions and allow an arbitration to proceed. When making that discretionary determination, the court weighs the *Freestone* factors.

When a party seeks to arbitrate a claim that otherwise would be part of the claims process under DUILA, the party must make a particularly strong showing.

> Given the statutory structure of the Uniform Act, its fundamental goal of centralizing delinquency proceedings under the control of the chief insurance regulator in the domiciliary jurisdiction, and the role of anti-suit injunctions in serving that public policy, a strong presumption exists that an existing anti-suit injunction should not be lifted to permit a claimant to litigate against the insolvent insurer [outside of the claims process].[155]

Permitting litigation elsewhere conflicts with DUILA's statutory requirement that claims "shall be filed with the receiver."[156] It also conflicts with this court's oversight role and the statutory command that "the receiver shall report the claim to the court,

---

[154] *Id.* at 1260–61.

[155] *Id.* at 1251–52; *see Principal Growth Strategies, LLC v. AGH Parent LLC*, 288 A.3d 1138 (Del. Ch. 2023) (granting motion to stay litigation in favor of ongoing insurer delinquency proceeding in Pennsylvania).

[156] 18 *Del. C.* § 5917(b).

specifying in such report the receiver's recommendation with respect to the action to be taken thereon," after which the court hears the claim.[157]

*Freestone* identified factors a court weighs when determining whether to allow parties to litigate outside a claims process, including:

> (1) The nature and extent of any connection between the foreign litigation and the domestic liquidation proceeding . . . .
>
> (2) The interests of judicial efficiency and litigant economy . . . .
>
> (3) Whether the foreign litigation would prejudice the interests of the Commissioner, other claimants, or other interested parties . . . .
>
> (4) The balance of hardships . . . .[158]

While the weight given the factors may vary based on a claimant's showing, the relationship between a claims process and arbitration makes it quite unlikely that an application to enforce an arbitration provision would succeed.

### a.     The Nature And Extent Of The Connection Between The Claim And The Liquidation Proceeding

The first *Freestone* factor addresses the risk that litigation elsewhere "could interfere with the liquidation proceeding."[159]

> The closer the connection is between the foreign litigation and the domestic liquidation proceeding, the greater the likelihood of interference. If the foreign litigation relates to a core function of the

---

[157] *Id.*

[158] *Freestone*, 143 A.3d at 1255–56.

[159] *Id.* at 1256.

59

receivership, such as marshaling assets or *assessing claims*, then this factor counsels against relief from an anti-suit injunction.[160]

By contrast, claims that "seek to impose liability on [the delinquent insurer] itself" are "precisely the type of litigation that interferes with a delinquency proceeding."[161] "Even the prospect of forcing the Commissioner to expend time and resources litigating elsewhere may be sufficient to cause this factor to weigh against relief, because a central purpose of the Uniform Act is 'to avoid dissipating a distressed insurer's assets by allowing it to be sued, and requiring it to defend, litigations scattered in many jurisdictions throughout the country.'"[162]

In *Freestone*, this first factor weighed against lifting the anti-suit injunction because the party seeking to litigate elsewhere had also filed claims notices.[163] Because the claims would otherwise "be handled as part of the insurance liquidation proceeding," they "relate[d] directly to the insurance liquidation proceeding."[164] In *Manhattan Re*, by contrast, the claim that would not otherwise have proceeded through the claims process.[165]

---

[160] *Id.* (emphasis added).

[161] *Principal Growth Strategies*, 288 A.3d at 1160.

[162] *Freestone*, 143 A.3d at 1256 (quoting *Manhattan Re*, 2011 WL 4553582, at *3).

[163] *Id.* at 1258.

[164] *Id.*

[165] *See Manhattan Re*, 2011 WL 4553582, at *2; *Freestone*, 143 A.3d at 1241 n.3, 1265.

Here, the Objectors contemplate arbitrating the very claims that the claims process otherwise would resolve. They ultimately seek to impose liability on the Company's estate, and conducting the arbitrations would force the Commissioner to devote resources to litigating in the arbitral forum. The first *Freestone* factor therefore weighs against arbitration.

### b. The Interests Of Judicial Efficiency And Litigant Economy

The second *Freestone* factor addresses "interests of judicial efficiency and litigant economy." This assessment involves several considerations:

a. Whether the foreign litigation can decide the issue more efficiently and expeditiously than the domestic liquidation proceeding;

b. Whether a specialized tribunal has been established to hear the particular cause of action and that tribunal has the expertise to hear such cases;

c. How far the foreign litigation has progressed, and

d. Whether the foreign litigation will completely resolve the issue.[166]

These factors are unlikely to favor arbitration.

In *Freestone*, the second factor weighed against lifting the anti-suit injunction because

the statutory liquidation proceeding is itself a specialized proceeding, overseen by the domiciliary court, in which the chief insurance regulator of the domiciliary state takes charge of the insurer's affairs, marshals its assets, and manages the Claims Process. The Claims Process itself serves as an additional form of specialized proceeding that permits classes of claims against an insolvent insurer to be resolved

---

[166] *Id.* at 1255.

expeditiously, particularly when those categories of claims will not be entitled to any distribution under the statutory priority scheme.[167]

Additionally, the foreign proceeding was "at an early stage," and the party seeking to lift the anti-suit injunction had not yet asserted its claims in that proceeding.[168]

The balancing is similar for an arbitration. The Objectors have not identified an arbitration clause that can decide claims more efficiently and expeditiously than the claims process. The Objectors have not identified an arbitration clause that contemplates a sophisticated tribunal of industry experts. The Objectors have not identified an arbitration that is already underway. The Objectors also have not identified an arbitration that would fully resolve a claim. At best, it would quantify the claim, which then would be handed through the claims process. The second *Freestone* factor generally weighs against arbitration.

### c. Prejudice To The Interests Of The Commissioner, Other Claimants, And Other Interested Parties

The third *Freestone* factor considers "the interests of the Commissioner, other claimants, or other interested parties."[169] That factor takes into account:

a. Whether the foreign litigation is likely to result in a judgment that will give rise to a claim entitled to a recovery in the domestic liquidation proceeding given its priority under the Uniform Act;

b. The amount of the likely payment relative to the burden on the insolvent domestic insurer, and

---

[167] *Id.* at 1259.

[168] *Id.* at 1260.

[169] *Id.* at 1255.

c. Whether the claim that would result from the foreign judgment would be subject to equitable subordination or other doctrines.[170]

In *Freestone*, the party seeking to lift the anti-suit injunction was unlikely to recover on its claim because the claim remained contingent as of the bar date and, even if the party succeeded in its separate litigation, the claim would fall into Class VI and be unlikely to generate a recovery.[171] Lifting the antisuit injunction therefore "would force the Commissioner to re-purpose scarce resources that otherwise could fund distributions to policyholders and other higher priority claimants," which "weigh[ed] heavily" against the motion.[172]

*Manhattan Re*, where the court directed the Commissioner to arbitrate, involved different facts. There, only eight remaining policy claims against Manhattan Re remained, so there was "no question that the remaining policyholders will be protected, regardless of whether the dispute over the AMICO Fund is resolved through arbitration or litigation in this Court"[173] Likewise, allowing arbitration would not prejudice the Commissioner because the dispute "did not actually involve

---

[170] *Id.*

[171] *Id.* at 1262.

[172] *Id.*

[173] *Manhattan Re*, 2011 WL 4553582, at *8; *see Freestone*, 143 A.3d at 1265 (recognizing that "permitting the arbitration to proceed did not present any risk that funds would be diverted from higher priority claimants and conflict with the core purposes of the Uniform Act" in *Manhattan Re*).

a claim against the estate."[174] Because the question involved whether and to what degree a fund was an asset of the estate, the dispute was "logically prior to the claims analysis and would have to be decided in any event, either by the court or someone else."[175]

Given the nature of the claims process, forcing the Commissioner to arbitrate claims that otherwise would go through that process generally will prejudice the Commissioner's interests. Engaging in arbitrations "dissipates the distressed insurer's assets by necessitating expenditures of limited resources" and "diverts the Commissioner's attention from managing the insolvent insurer's affairs, marshaling its assets, and overseeing the Claims Process."[176] The third *Freestone* therefore generally weighs against forcing the Commissioner to arbitrate.

In the context of a specific claim, the court would assess whether the arbitration would be likely to result in a judgment that would be participate in a recovery through the claims process given its relative priority. The court also would assess amount of the likely payment relative to the burden on the insolvent domestic insurer and whether the claim would be subject to equitable subordination or other doctrines. To the extent those factors are pertinent, however, they operate to reduce the likelihood that the court will lift the Antisuit Injunctions. Even in a setting where

---

[174] *Id.*

[175] *Id.*; *see Manhattan Re*, 2011 WL 4553582, at *8.

[176] *Freestone*, 143 A.3d at 1251.

64

the claimant would participate, where the amount of the recovery is large, and where the claim is not subject to equitable subordination or other defenses, the more efficient course is to handle the claim through the claims process.

### d. The Balance Of Hardships

The last *Freestone* factor considers "whether the party wishing to proceed with foreign litigation has shown that the hardship it would suffer from not being able to proceed considerably outweighs the hardship to the Commissioner and the insolvent domestic insurer."[177] In *Freestone*, the proceeding with the foreign litigation "yield[ed] no benefits, only costs" from the Commissioner's perspective and "yield[ed] at best intangible benefits" from the claimant's perspective.[178] "The analysis of the preceding factors foreshadow[ed] the outcome of this one."[179]

The same is the case for arbitrating claims that otherwise would be subject to the claims process. The Commissioner suffers hardship from the cost and distraction of piecemeal arbitrations, while the claimants risk hardship from not being able to arbitrate. Absent unique circumstances, the balance of hardships is unlikely to be dispositive.

---

[177] *Id.* at 1255–56.

[178] *Id.* at 1262–63.

[179] *Id.* at 1262.

### 3. Issue-Specific Applications

This decision has rejected the Objectors' contention that the court must enforce arbitration provisions even where that would conflict with the claims process. This decision has also explained the framework the court will apply when evaluating case-specific requests to lift the Antisuit Injunctions and pursue arbitration. Given the possibility that a claimant could identify unique features of a contractual provision or claim that could warrant a case-specific outcome, this decision does not rule out mandatory arbitration entirely. But any claimant seeking claim-specific relief from the Antisuit Injunctions must explain why the *Freestone* factors favor it.

## F. Discovery And Information Requests

Another dispute concerns the Objectors ability to obtain information from the Commissioner about their claims. The Objectors also dispute what consequences should ensue if they fail to provide information that the Commissioner requests.

### 1. The Claimants' Right To Information

The Objectors contend that the proposed Dispute Procedures do not provide a sufficient opportunity for them to obtain information. They propose that discovery "shall be available to … all creditors and is to be conducted in accordance with the rules of procedure applicable in the State of Delaware."[180]

In lieu of discovery, the Dispute Procedures currently contemplate the following exchanges of information.

---

[180] Dkt. 909 ¶ 22(c).

- First, "[t]o the extent not already provided, the claimant will provide the Receiver with every document that the claimant intends to rely on in support of its position for each Component Claim Group."[181]

- Next, the Receiver will "provide the claimant with the information that the Receiver intends to rely on in support of its position for each Component Claim Group."[182]

- Finally, the claimant may seek additional information from the Commissioner but "has the burden to demonstrate, with specificity, that the information being sought is (a) relevant and necessary for the evaluation of the dispute and (b) why obtaining the information from the Receiver is the least burdensome method for the claimant to obtain the information being sought."[183]

The Objectors view those procedures as imbalanced and unfair.[184]

As a threshold matter, the Dispute Procedures foreclosure of discovery is not contrary to law. DUILA does not contemplate Rule 26 discovery. The claims process is not a plenary litigation where full-bore discovery makes sense. It is a specialized procedure, conducted by the Commissioner, that is designed to resolve claims in an orderly, efficient, and equitable manner.

This court has held that claimants do not have a right to plenary discovery in a claims process. In *Indemnity Insurance*, a claimant objected to the Commissioner's claim procedures because they "lacked an opportunity to conduct discovery."[185] The

---

[181] Dkt. 853, at Ex. 1 § 4.2.1.

[182] *Id.* § 4.2.2.

[183] *Id.* § 4.2.3.

[184] *See* Dkt. 909 ¶ 27.

[185] *In re Indem. Ins. Corp., RRG,* 2020 WL 4795385, at *1 (Del. Ch. Aug. 17, 2020).

court approved the procedures as consistent with DUILA, noting that DUILA does not contemplate discovery.[186] Courts in other states have reached similar conclusions.[187]

The question then becomes whether the Commissioner's proposed information-sharing procedures constitute an abuse of discretion. The Objectors have failed to make the necessary showing.

The Dispute Procedures contemplate initially that the Commissioner provide the information on which he intends to rely to support his recommendation. The Dispute Procedures also permit a claimant to seek additional information by showing that the information they seek is "relevant and necessary for the evaluation of the dispute" and "why obtaining the information from the Receiver is the least burdensome method for the claimant to obtain the information being sought."[188]

---

[186] *Id.* (citing, *inter alia*, 18 *Del C.* § 5917).

[187] *See Fewell v. Pickens*, 57 S.W.3d 144, 149–50 (Ark. 2001) (stating that the "Rules of Civil Procedure, which contain guidelines and rules for the discovery process, do not apply in receivership proceedings" and that the trial court has "discretion in limiting the scope and timing of discovery" in liquidation proceedings); *Integrity*, 754 A.2d at 1186 (N.J. 2000) (holding that an insurance commissioner "functions in a hybrid status, part public and part private, when he or she oversees the liquidation of an insolvent insurer," which distinguished the case from "an ordinary discovery issue between private citizens in which all relevant evidence is presumed to be discoverable" and "negates the presumption in favor of discovery" that otherwise would exist); *Cascade Nat.*, 321 P.3d at 290–91 (affirming denial of motion to compel, holding that Washington's "statutory scheme for administering proofs of claim requires claimants to produce evidence to support their own claim; it does not, however, provide a process for obtaining discovery from the Receiver").

[188] Dkt. 853, at Ex. 1 § 4.2.3.

Those procedures are consistent with DUILA's the goals of protecting insurer's assets against unnecessary dissipation and promoting the orderly, expeditious, and equitable resolution of claims.

The Objectors worry that the Commissioner will take unreasonable positions when rejecting their requests for information. That is not a basis for rejecting the Dispute Procedures as a whole. The Commissioner cannot abuse his discretion when denying requests for additional information. If he does, a claimant can seek relief from the court.

### 2. The Commissioner's Information Requests

The Objectors contend that the proposed Dispute Procedures authorize the Commissioner to request information in connection with a claim dispute and provide that "[f]ailure to provide information requested by the Receiver is grounds for the claim to be denied" (an "Informational Denial").[189] The Objectors ask the court to overrule the allowance for Informational Denials.

An Informational Denial is not contrary to law. The insurance statutes in some states expressly authorize Informational Denials.[190] DUILA does not, but it also does

---

[189] *Id.* § 3.2.4.

[190] *See, e.g.*, Alaska Stat. § 21.78.170(e) ("A claim need not be considered or allowed if it does not contain all the information in (a) of this section that might be applicable. The receiver may require that a prescribed form be used and may require that other information and documents be included."); Okla. Stat. tit. 36, § 1918(A) ("Claimant shall, in the time and manner set forth by the receiver, fully comply with any and all requests by the receiver for claimant to provide information or evidence

not forbid them. DUILA implicitly contemplates Informational Denials by requiring that a claim "set forth in reasonable detail the amount of the claim or the basis upon which such amount can be ascertained, the facts upon which the claim is based and the priorities asserted, if any," be verified by affidavit, and "be supported by such documents as may be material thereto."[191] The informational conditions to a valid claim imply that the Commissioner can deny a non-compliant claim.

Because an Informational Denial is not contrary to law, the question becomes whether the Commissioner has abused his discretion by proposing it. The Objectors have not shown that including the claim-denial provision constitutes an abuse of discretion.

To authorize Informational Denials does not mean the Commissioner can deny a claim arbitrarily. If the Commissioner does, then a claimant can challenge that decision.

## G. The Retrocessionaire Objections

The next two objections come from Objectors who are retrocessionaires. Neither warrants relief.

---

supplementary to that required in this article, including, but not limited to, testimony under oath, affidavits, and depositions.").

[191] 18 *Del. C.* § 5917(a).

### 1. The Retrocessionaires' Notice, Investigation, And Interposition Rights

Several retrocessionaires cite provisions that purport to require that the Commissioner notify them of claims against the Company, allow them to investigate the claims at their expense, and authorize them to interpose defenses to the claims that the Commissioner has not raised. They object that the Final Determination Procedures do not expressly recognize those rights. The objection is denied. The rights in question cannot bind the Commissioner, but in any event, the Commissioner has committed to apply the Final Determination Procedures to accommodate what the retrocessionaires wish to do.

Thankfully, the retrocessionaires have not deluged the court with all of their agreements. The parties instead agree that a typical provision states:

> [I]n the event of such insolvency, the liquidator, receiver or statutory successor of [the Company] will give written notice of a pending claim against [the Company] on the reinsured policy. It will do so within a reasonable time after the claim is filed in the insolvency proceedings. During the pendency of such a claim, the RETROCESSIONAIRE may investigate the claim and may, at its own expense, interpose any defense or defenses which it may deem available to [the Company], its liquidator, receiver or statutory successor, in the proceedings where the claim is to be adjudicated.[192]

The provision thus only comes into play in the event of insolvency, and only purports to bind the government official acting as liquidator, receiver or statutory successor of

---

[192] Dkt. 903 ¶ 14.

the Company. It is not a provision that applies to the Company in the ordinary course of business.

DUILA does not contain language expressly authorizing or expressly prohibiting provisions of this sort. But without express statutory authorization, parties cannot include springing provisions in their private agreements that would bind a state regulator to obligations that apply only when the state regulator assumes control of the regulated entity. As with an arbitration provision, a contractual provision that purports to bind the Commissioner is not directly enforceable against the Commissioner, who is not a party to the agreements. This is also not a provision where the parties can argue that the Commissioner stands in the shoes of the Company, because the provision only springs into existence after insolvency when the Commissioner takes action.

Private counterparties also cannot override statutory mandates. Under DUILA, the Commissioner controls the claims process, evaluates claims, and determines what defenses to raise.[193] Permitting a contractual counterparty to force the Commissioner to assert defenses would impermissibly interfere with the Commissioner's ability to achieve the orderly, expeditious, and equitable resolution of claims. Private counterparties also cannot bind the court, and the springing notice

---

[193] *See* 18 *Del. C.* § 5917(c) ("[T]he receiver shall report the claim to the court, specifying in such report the receiver"s recommendation with respect to the action to be taken thereon.").

requirement in a private agreement cannot override DUILA's mandatory provision empowering the court to determine the extent to which notice is required.[194]

Unlike Delaware, some state statutes authorize these provisions. For example, California's Insurance Code states:

> The reinsurance contract may provide that the conservator, liquidator, or statutory successor of a ceding insurer shall give written notice of the pendency of a claim against the ceding insurer indicating the policy or bond reinsured, within a reasonable time after such claim is filed and the reinsurer may interpose, at its own expense, in the proceeding in which the claim is to be adjudicated, any defense or defenses which it may deem available to the ceding insurer or its conservator, liquidator, or statutory successor.[195]

Where statutes authorize those provisions, courts generally enforce them.[196]

The fact that some states have taken the trouble to expressly authorize those provisions suggests that the absence of authorization carries significance. It would represent a major privatization of government authority to permit private parties to impose obligations on the Commissioner that he must follow when conducting a

---

[194] *See id.* ("Upon receipt of such report, the court shall fix a time for hearing the claim and shall direct that the claimant or the receiver, as the court shall specify, shall give such notice as the court shall determine to such persons as shall appear to the court to be interested therein.").

[195] Cal. Ins. Code § 922.2(a)(2); *see also* Ala. Code § 27-5B-18; 215 Ill. Comp. Stat. 5/173.4; N.Y. Ins. Law § 1308(a)(3); S.D. Codified Laws § 58-14-4.2.

[196] *See Keehn v. Excess Ins. Co. of America*, 129 F.2d 503 (C.C.A. 7th Cir. 1942) (applying Illinois law and affirming lower court's decision that failure to give notice of a claim barred the insolvent insurer's receiver from recovering on a claim against the reinsurer); *In re Liquidation of Midland Ins. Co.*, 856 N.Y.S.2d 498, 2008 WL 151786, at \*20 (N.Y. Sup. Ct. 2008) (TABLE), *aff'd*, 929 N.Y.S.2d 116 (N.Y. App. Div. 2011).

statutory delinquency proceeding. There would be no reason to stop at notice requirements, investigation opportunities, or interposition rights. Parties could simply lay out in their agreements what the Commissioner would have to do. If Delaware law is to take that step, the General Assembly must authorize it.

The Commissioner has nevertheless represented that he will provide reasonable notice of pending claims. He has also represented that the Final Determination Procedures do not prevent retrocessionaires from conducting their own independent claim investigations. And he has represented that the retrocessionaires can raise their own defenses by objecting to claim recommendations that the Commissioner presents to the court. At present, however, the Final Determination Procedures are not clear on these points. They state only that "[t]he Court may, by Order, on its own accord or upon request of an interested person, alter any Procedure for a final hearing with notice to the Receiver and the Claimant(s) involved in such final hearing."[197] The Commissioner must update the Final Determination Procedures to make those commitments express.

Those procedures give the retrocessionaires everything they would be entitled to under a regime that specifically authorized the provisions in question. New York law authorizes the provisions, and its approach offers guidance. In *Midland,* the court explained that notice and interposition provisions conferred "discrete rights that neither give rise to, nor should be confused with, an all-encompassing right to be

---

[197] Dkt. 921, at Ex. 1 § 4.2.

involved in the [Commissioner's] internal process of adjusting claims."[198] The court reasoned that

> [i]f a reinsurer interposes a defense while the [Commissioner] is adjusting a claim, adjudicating the defense would interfere with and interrupt the [Commissioner's] process of allowing, disallowing, or settling claims. The [Commissioner] would have to devote significant time, personnel, and expense evaluating the defenses that the reinsurer seeks to interpose. In a situation where a claim involves several reinsurers, each interposing different defenses, the [Commissioner] would find himself in the unmanageable position of either having to assert the defenses interposed by every reinsurer, or having to choose defenses over a reinsurer's protest.[199]

But the trial court also explained that it would be too late if the reinsurer could not interpose a defense until after the court ruled on the Commissioner's recommendation, because raising the defense at that would undercut the finality of judgments.[200] The court concluded that "the only logical approach is to permit . . . reinsurers to exercise their contractual interposition rights after the Liquidator has allowed a claim, but prior to the Court's approval of a claim."[201]

The Commissioner has already committed to a *Midland*-style regime. The Commissioner has agreed to provide reasonable notice to the retrocessionaires and acknowledges that they can conduct their own investigations at their own expense.

---

[198] *Midland*, 2008 WL 151786, at *20.

[199] *Id.* at *24–25.

[200] *Id.* at *25.

[201] *Id.*

The Commissioner also recognizes that "if the receiver doesn't give a [notice] and the retro believes that it's been prejudiced by that, then they certainly have the ability to raise that in defense to a claim that the receiver eventually brings to recover reinsurance."[202] Once the Commissioner makes a recommendation on a claim and submits it to the court, a retrocessionaire with rights under an interposition provision can assert additional defenses by filing an objection to the claim.[203] The retrocessionaire may brief its objection, and the court will rule on it as part of the claims process.

Because the Final Determination Procedures give the retrocessionaires everything they could receive even if DUILA authorized their notice, investigation, and interposition provisions, the objection is overruled.

### 2. A Termination Date For Retrocessionaire Reinsurance Agreements

The retrocessionaires' other objection seeks a specific termination date for their reinsurance agreements. They complain that the Commissioner intends to leave their agreements in place. That objection is overruled.

The Liquidation Order fixed the rights and liabilities between the Company and its cedents and imposed an outside date when any reinsurance agreements between the Company and its cedents would terminate. The Liquidation Order did

---

[202] Dkt. 1017, at 57.

[203] Dkt. 921, at Ex. 1 § 4.2; Dkt. 989, at 23.

not do the same for the retrocessionaires. Instead, it allowed the Commissioner to "terminate, cancel, or rescind any reinsurance contract with a retrocessionaire of SRUS . . . that is contrary to the best interests of the receivership."[204] The Liquidation Order completed that, "[p]ursuant to 18 *Del. C.* §5924, the rights and liabilities between SRUS and its retrocessionaires shall be fixed as of a date to be later determined by the Court upon application by the Receiver."[205]

The retrocessionaires ask the court to determine that their agreements with the Company necessarily terminated at the same time as the underlying cedent contracts. They claim Delaware law does not allow the court to set different dates for the liabilities of different creditors. They rely on Section 5924 of DUILA, which states:

> The rights and liabilities of the insurer and of its creditors, policyholders, stockholders, members, subscribers and all other persons interested in its estate shall, unless otherwise directed by the court, be fixed as of the date on which the order directing the liquidation of the insurer is filed in the office of the clerk of the court which made the order, subject to the provisions of this chapter with respect to the rights of claimants holding contingent claims.[206]

The retrocessionaires argue that this section permits the court to set a liquidation date for all creditors that is different from the date of the liquidation order but does not authorize different liquidation dates for different creditors.

---

[204] Dkt. 799 ¶ 20(b).

[205] *Id.* ¶ 21(a).

[206] 18 *Del. C.* § 5924.

Section 5924 does not say what the retrocessionaires think it does. The statute establishes a default date for fixing rights and liabilities equal to "the date on which the order directing the liquidation of the insurer is filed." That date applies "unless otherwise directed by the court." The statute says nothing about what the court can do when it otherwise directs. The statute does not limit the court to a single date, although it also does it expressly authorize multiple dates.

No Delaware court has addressed this issue, and case law from other jurisdictions is sparse. The retrocessionaires cite cases from Oklahoma, but they do not address the "unless otherwise directed by the court" language.[207] In *Empire State*, a decision predating the Uniform Act, the New York Court of Appeals cautioned that the phrase "unless otherwise directed by the court" was not intended to make it "discretionary with the court to classify and reclassify the claims against the insolvent estate."[208] To avoid favoring or impairing different classes of claims, New York Court of Appeals provided that any date the court picked "shall apply equally to all who have claims against the insolvent estate."[209]

---

[207] *See Joplin Corp. v. State ex rel. Grimes*, 570 P.2d 1161, 1164 (Okla. 1977) (considering situation in which "[t]he trial court found all assets and liabilities of Community were determined at the date of the order of liquidation"); *see also Roush v. Nat'l Old Line Ins. Co.*, 453 F. Supp. 247, 253 (W.D. Okla. 1978) (referencing statutes as fixing rights and liabilities as of the date of the liquidation order).

[208] *In re Empire State Sur. Co.*, 108 N.E. 825, 828 (N.Y. 1915).

[209] *Id.* at 829.

Although the Uniform Act takes a more flexible approach to the liquidation process that could envision different dates for different types of claims, the reasoning in *Empire State* suggests that a presumption should exist against setting different dates for different classes of claims against the estate. *Empire State* does not address the possibility of setting different dates for (1) claims against the estate by its debtors and (2) claims by the estate against its creditors. The retrocessionaires objection to their agreements remaining in force falls into the latter bucket, not the former.

DUILA does not expressly forbid setting a termination date for claims against the Company while allowing the Company to keep its contracts with its retrocessionaires in place. The question therefore becomes whether doing so constitutes an abuse of discretion.

The decision not to set a termination date for the retrocessionaire reinsurance agreements serves a rational purpose. Imposing a bar date for claims *against* the estate enables the Commissioner to determine the total allowed liabilities that the estate faces. The Commissioner needs to understand the estate's exposure so he can seek coverage from the insolvent insurer's reinsurers—here, the retrocessionaires— when marshalling the estate's assets. Keeping the retrocessionaire's reinsurance agreements in place enables the Commissioner to assert claims against the retrocessionaire under those agreements. They agreed to provide reinsurance coverage to the Company, and their agreements are assets of the estate.

Keeping the retrocessionaire agreements in place is not unfair to the retrocessionaires. They committed to provide coverage, and it is always possible that

an insurer can become insolvent and enter liquidation. They are not facing an unexpected scenario. They simply must perform under the terms of their agreements.

The retrocessionaires make one valid point. They fear a situation where they must submit a claim for unpaid premiums as part of the proof of claim process, yet will not know how much to seek because their agreements may continue in force through an unspecified date. Whether that issue ripens depends on whether and when the Commissioner stops paying premium, and whether any premium owed can be offset against a portion of the liabilities the retrocessionaires would otherwise owe on their contracts.

So long as the Commissioner continues to pay premium under the reinsurance agreements with the retrocessionaires, those agreements remain in effect. If the Company stops paying premium, but the retrocessionaires face claims under the agreements, then the unpaid premium can be deducted from the amounts otherwise due. The only setting in which an issue arises would be if the Company stopped paying premium and the premium due exceeded the Company's claims under the agreements. In that setting, the court could treat the retrocessionaire reinsurance agreement as terminated when the Company stopped paying premium, and the retrocessionaire would not be harmed. If there are other, more nuanced settings that present themselves, the court can deal with them in due course.

It is not an abuse of discretion for the Commissioner to decline to set a date when the Company's reinsurance agreements with the retrocessionaires terminate. The objection is overruled.

### H. Administrative Expenses

The last issue involves administrative expenses. Some objectors complain that the Commissioner failed to seek court approval before paying administrative expenses.[210] The Commissioner has mooted this objection by agreeing to submit administrative expenses for approval in connection with his annual accountings.[211] He submitted the expenses in question for approval, and after no one objected, the court approved them.[212]

### III.    CONCLUSION

The Commissioner's motions are granted. The objections are overruled. Within thirty days, the Commissioner must file updated versions of the procedures consistent with this decision.

---

[210] *See* Dkt. 909 ¶ 31 & n.5.

[211] *See* Dkt. 1019 ¶ 9 ("Because there are no State Guaranty Associations involved in the SRUS liquidation proceedings, who typically reviews such expenses on a periodic basis in conjunction with early access petitions, the Receiver agrees to submit for approval the expenses incurred and identified in the annual accountings filed with the Court at or about the time when the accounting in which they are contained is filed with the Court.").

[212] Dkt. 1027.

**APPENDIX A: State Insurer Receivership Statutes Reference Guide**

| State | UILA | IRLMA | IRMA |
|-------|------|-------|------|
| AL | Ala. Code § 27-32-22 | | |
| AK | Alaska Stat. § 21.78.100 | [Alaska Stat. §§ 21.78.010–21.78.330][213] | |
| AZ | Ariz. Rev. Stat. Ann. § 20-631 | | Ariz. Rev. Stat. Ann. §§ 20-611–20-650[214] |
| AR | Ark. Code. Ann. § 23-68-101 | | |
| CA | Cal. Ins. Code § 1064.12[215] | | |
| CO | | Colo. Rev. Stat. §§ 10-3-401–10-3-559 | |
| CT | | Conn. Gen. Stat. § 38a-903 | |
| DE | 18 *Del. C.* § 5920 | | |
| DC | | D.C. Code §§ 31-1301–31-1357 | |
| FL | Fla. Stat. §§ 631.011–631.201[216] | *[See footnote below]* | |
| GA | | Ga. Code. Ann. § 33-37-1 | |
| HI | | Haw. Rev. Stat. 431:15-101[217] | |

---

[213] Alaska has expressly adopted the Uniform Act, but modified several of its provisions. Other provisions go beyond the Uniform Act to add further detail. The IRMA State Page Key lists Alaska as having adopted a previous version of the NAIC model act, which appears to refer to the IRLMA. *See* https://content.naic.org/sites/default/files/model-law-state-page-555.pdf ("State Page Key") at ST-555-2.

[214] Arizona has expressly adopted the Uniform Act, but it has also adopted portions of IRMA, such as a provision addressing Qualified Financial Contracts. *See* Ariz. Rev. Stat. Ann. § 20-637.

[215] Cal. Ins. Code § 1064.12 refers to the "Uniform Insurers Rehabilitation Act" rather than "Uniform Insurers Liquidation Act."

[216] Florida has adopted many Uniform Act provisions, often in modified form. Florida has also adopted many bespoke provisions. Somewhat confusingly, Florida refers to its law as the "Insurers Rehabilitation and Liquidation Act," reminiscent of IRLMA even though Florida's statute does not track IRLMA closely.

[217] Haw. Rev. Stat. 431:15-101 titles Hawaii's statute the "Insurers Supervision, Rehabilitation and Liquidation Act."

| State | UILA | IRLMA | IRMA |
|-------|------|-------|------|
| ID | | Idaho Code § 41-3301[218] | |
| IL | 215 Ill. Comp. Stat. 5/221.13[219] | | |
| IN | | Ind. Code §§ 27-9-1-1–27-9-4-10 | |
| IA | | Iowa Code § 507C.1[220] | |
| KS | | Kan. Stat. Ann. § 40-3605[221] | |
| KY | | Ky. Rev. Stat. Ann. § 304.33-010 | |
| LA | La. Stat. Ann. § 22:2038 | | |
| ME | Me. Stat. tit. 24-a § 4363 | | Me. Stat. tit. 24-a §§ 4351–4407[222] |
| MD | Md. Code Ann. Ins. § 9-202 | | |
| MA | Mass Gen. Laws ch. 175 §§ 180A–180L ¾[223] | | |
| MI | | Mich. Comp. Laws §§ 500.8101–500.8159 | |
| MN | | Minn. Stat. § 60B.01 | |
| MS | | Miss. Code Ann. § 83-24-1 | |

---

[218] Idaho Code § 41-3301 titles Idaho's statute the "Idaho Insurers Supervision, Rehabilitation, and Liquidation Act."

[219] The Illinois statute refers to the "Uniform Reciprocal Liquidation Act" rather that the "Uniform Insurers Liquidation Act."

[220] Iowa Code § 507C.1 titles Iowa's statute the "Insurers Supervision, Rehabilitation, and Liquidation Act."

[221] Kan. Stat. Ann. § 40-3605 titles Kansas's statute the "insurers supervision, rehabilitation and liquidation act."

[222] Maine has expressly adopted the Uniform Act, but it has also adopted portions of IRMA. *See* State Page Key at ST-555-4. For example, Maine has adopted a provision based on IRMA's section on "Qualified Financial Contracts." *See* Me. Stat. tit. 24-a § 4387.

[223] Massachusetts has not expressly adopted the Uniform Act but has adopted a number of parallel provisions, along with modifications and other bespoke provisions.

| State | UILA | IRLMA | IRMA |
|-------|------|-------|------|
| MO | Mo. Rev. Stat. § 375.950[224] | Mo. Rev. Stat. §§ 375.1150–375.1246[225] | Mo. Rev. Stat. §§ 375.1150–375.1246[226] |
| MT | | Mont. Code. Ann. § 32-2-1301[227] | |
| NE | | Neb. Rev. Stat. §44-4801[228] | |

---

[224] Missouri's version of the Uniform Act only applies to proceedings instituted before August 28, 1991. *See* Mo. Rev. Stat. § 375.950(2).

[225] Missouri statute Sections 375.1150 to 375.1246 constitute the "Insurers Supervision, Rehabilitation and Liquidation Act." *See* Mo. Rev. Stat. § 375.1150.

[226] The State Page Key indicates that Missouri has adopted portions of IRMA. *See* Page Key at ST-555-4. For example, Missouri has adopted a provision based on IRMA's section on "Setoffs." *See* Mo. Rev. Stat. § 375.1198.

[227] Mont. Code. Ann. § 32-2-1301 titles Montana's statute the "Insurers Supervision, Rehabilitation, and Liquidation Act."

[228] Neb. Rev. Stat. §44-4801 titles Nebraska's statute the "Nebraska Insurers Supervision, Rehabilitation, and Liquidation Act."

| State | UILA | IRLMA | IRMA |
|-------|------|-------|------|
| NV | Nev. Rev. Stat. § 696B.280[229] | [Nev. Rev. Stat. §§ 696B.010–696B.570][230] | Nev. Rev. Stat. § 696B.280[231] |
| NH | | N.H. Rev. Stat. Ann. § 402-C:1 | |
| NJ | N.J. Stat. Ann. § 17:30C-23 | N.J. Stat. Ann. § 17B:32-31 (for life and health insurers)[232] | |
| NM | N.M. Stat. Ann. § 59A-41-17 | | |
| NY | N.Y. Ins. Law § 7408 | | |

[229] In 2007, Nevada amended Nev. Rev. Stat. § 696B.330 (formerly nearly identical to 18 *Del. C.* § 5917) to provide, among other changes, that claims "must be filed in the manner and form established by the receiver." In 2019, Nevada amended Nev. Rev. Stat. § 696B.280 to provide that its version of the Uniform Act "shall be so interpreted as to effectuate the general purpose to make uniform the laws of those states which enact the Uniform Insurers Liquidation Act *or the Insurer Receivership Model Act.*" Nev. Rev. Stat. § 696B.280(3) (emphasis added). The only other changes to the statute included amending the definition of "reciprocal state" to include states "in which in substance and effect the provisions of the Uniform Insurers Liquidation Act *or the Insurer Receivership Model Act* are in force" and adding new Sections 696B.332 and 696B.334 on reporting and filing requirements of the receiver and guaranty associations. Nev. Rev. Stat. § 696B.150 (emphasis added); *id.* §§ 696B.332, 696B.334.

[230] Nevada has expressly adopted the Uniform Act, but it has other statutory provisions that add further detail to the delinquency process. The State Page Key lists Nevada as having adopted a previous version of the NAIC model act, which appears to refer to the IRLMA.

[231] See note above regarding the limited reference to IRMA in the Nevada statute.

[232] The New Jersey Senate Commerce Committee Statement from 1992 provides as follows:

This bill, the "Life and Health Insurers Rehabilitation and Liquidation Act," provides a detailed framework under which life and health insurers may be rehabilitated or liquidated. The rehabilitation and liquidation schemes under this bill apply not only to commercial life and health insurers but to fraternal benefit societies, mutual benefit associations, hospital service corporations, medical service corporations, health service corporations, dental service corporations, dental plan organizations and health maintenance organizations. The current rehabilitation and liquidation procedures applicable to these various entities are repealed under the bill.

4

| State | UILA | IRLMA | IRMA |
|-------|------|-------|------|
| NC | | N.C. Gen. Stat. §§ 58-30-1–58-30-310 | |
| ND | | N.D. Cent. Code §§ 26.1-06.1-01–26.1-06.1-59 | |
| OH | | Ohio Rev. Code. Ann. §§ 3903.01–3903.59[233] | |
| OK | Okla. Stat. tit. 36, § 1921 | [Okla. Stat. tit. 36, §§ 1901–1938][234] | Okla. Stat. tit. 36, § 1922[235] |
| OR | Or. Rev. Stat §§ 734.014, 734.026, 734.110, 734.120, 734.130, 734.210–734.320[236] | [Or. Rev. Stat. §§ 734.014–734.440][237] | |
| PA | | 40 Pa. Cons. Stat. §§ 221.1–221.63 | |
| PR | | P.R. Laws Ann. tit. 26, §§ 4001–4054 | |
| RI | 27 R.I. Gen. Laws § 27-14.4-1[238] | 27 R.I. Gen. Laws § 27-14.3-1 | |
| SC | | S.C. Code Ann. § 38-27-10 | |

---

[233] Ohio Rev. Code. Ann. § 3903.02 titles Ohio's statute the "insurers supervision, rehabilitation, and liquidation act."

[234] Oklahoma has expressly adopted the Uniform Act, but it has other statutory provisions that add further detail to the rehabilitation and liquidation requirements. The State Page Key lists Oklahoma as having adopted a previous version of the NAIC model act, which appears to refer to the IRLMA.

[235] The State Page Key identifies Okla. Stat. tit. 36, § 1922 as having adopted "portions" of IRMA.

[236] The chapter of Oregon's insurance code on Rehabilitation, Liquidation and Conservation of Insurers does not expressly reference the Uniform Act, but many of its provisions track the Uniform Act and were adopted before IRLMA. *See* Or. Rev. Stat §§ 734.014, 734.026, 734.110, 734.120, 734.130, 734.210–734.320.

[237] Oregon has provisions that go beyond the Uniform Act and add further detail to the delinquency process requirements. The State Page Key lists Oregon as having adopted a previous version of the NAIC model act, which appears to refer to the IRLMA.

[238] Rhode Island has adopted much of the Uniform Act and IRLMA.

| State | UILA | IRLMA | IRMA |
|-------|------|-------|------|
| SD | | S.D. Codified Laws § 58-29B-1[239] | |
| TN | | Tenn. Code Ann. § 56-9-101 | Tenn. Code Ann. §§ 56-9-101–56-9-511[240] |
| TX | | | Tex. Ins. Code Ann. § 443.001 |
| UT | | | Utah Code Ann. § 31A-27a-101 |
| VT | | Vt. Stat. Ann. tit. 8, §§ 7031–7100 | |
| VI | V.I. Code Ann. tit. 22, § 1261 | | |
| VA | | N/A[241] | |
| WA | Wash. Rev. Code § 48.99.010 | [Wash Rev. Code §§ 48.31.010–48.31.435][242] | |
| WV | W. Va. Code § 33-10-21 | [W. Va. Code §§ 33-10-1–33-10-41][243] | |

---

[239] S.D. Codified Laws § 58-29B-1 titles South Carolina's statute the "Insurers Supervision, Rehabilitation, and Liquidation Act."

[240] While Tennessee has adopted the IRLMA, it has also adopted portions of IRMA. *See* State Page Key at ST-555-6. For example, Tennessee has adopted a version of the IRMA section on "Qualified Financial Contracts." Tenn. Code Ann. § 56-9-338.

[241] Virginia's statutory Chapter on Rehabilitation and Liquidation of Insurers does not appear to adopt any of the uniform or model acts. Most notably, it provides for the possibility that the court can appoint someone other than the Commission as the receiver. *See* Va. Code Ann. § 38.2-1504.

[242] Washington has adopted many provisions governing rehabilitation, liquidation, and supervision of insurers that go beyond the Uniform Act's definition of "insurer." *See* Wash Rev. Code § 48.31.020. Some of these provisions parallel language from the IRLMA; others are bespoke. *See, e.g.*, Wash. Rev. Code § 48.31.030 (describing grounds for rehabilitation, including language that appears in Section 16 of IRLMA). The State Page Key lists Washington as having adopted a previous version of the NAIC model act, which appears to refer to the IRLMA.

[243] West Virginia has expressly adopted the Uniform Act, but it has other statutory provisions that go further. The State Page Key lists West Virginia as having

| State | UILA | IRLMA | IRMA |
|-------|------|-------|------|
| WI | | Wis. Stat. § 645.01 | |
| WY | Wyo. Stat. Ann. § 26-28-119 | | |

adopted a previous version of the NAIC model act, which appears to refer to the IRLMA.

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| § 5901 (2)– (13) | Definitions of "Insurer," "Delinquency proceeding," "State," "Foreign country," "Domiciliary state," "Ancillary state," "Reciprocal state," "General assets," "Preferred claim," "Special deposit claim," "Secured claim," and "Receiver" | Ala. Code § 27-32-1<br>Alaska Stat. § 21.78.330<br>Ariz. Rev. Stat. Ann. § 20-611<br>Ark. Code. Ann. § 23-68-102<br>Cal. Ins. Code § 1064.1(a)–(e), (g)–(k)<br>Fla. Stat. § 631.011(2), (6), (7), (10), (15), (18), (20)–(23)<br>215 Ill. Comp. Stat. 5/221.1<br>La. Stat. Ann. § 22:2038<br>Me. Stat. tit. 24-a § 4353<br>Md. Code Ann. Ins. § 9-201[244]<br>Mass Gen. Laws ch. 175 § 180A<br>Mo. Rev. Stat. § 375.950[245]<br>Nev. Rev. Stat. §§ 696B.030–696B.040, 696B.060–696B.090, 696B.120–696B.180<br>N.J. Stat. Ann. § 17:30C-1<br>N.M. Stat. Ann. §§ 59A-41-3–59A-41-4, 59A-41- | Cal. Ins. Code § 1064.01(f) (more detailed definition of "Reciprocal state" than DUILA)<br>Mass Gen. Laws ch. 175 § 180A (more detailed definition of "Reciprocal state" than DUILA)<br>Nev. Rev. Stat. § 696B.150 ("Reciprocal state" includes states with IRMA provisions in force)<br>N.J. Stat. Ann. § 17:30C-1(b)–(k) (lacks definitions of "State" and "Foreign country")<br>N.M. Stat. Ann. §§ 59A-41-3–59A-41-13 (lacks definition of "State")<br>N.Y. Ins. Law § 7408(b) (lacks definition of "State")<br>Or. Rev. Stat § 734.014 (lacks definitions of "State," "Domiciliary state," "Ancillary state," and "Preferred claim")<br>27 R.I. Gen. Laws § 27-14.4-2(5) (expressly excluding unearned premiums from definition of "General assets") |

---

[244] The Maryland statute's definitions generally track those in 18 *Del. C.* § 5901 but have several differences. For example, DUILA's definition of "domiciliary state" is more detailed.

[245] Missouri's Uniform Act only applies to proceedings instituted before August 28, 1991. *See* Mo. Rev. Stat. § 375.950(2).

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| | | 6–59A-41-9, 59A-41-12–59A-41-13[246]<br>N.Y. Ins. Law § 7408<br>Okla. Stat. tit. 36, § 1901<br>Or. Rev. Stat §§ 734.014(1)–(4), (6)–(9), 734.026<br>27 R.I. Gen. Laws § 27-14.4-2<br>V.I. Code Ann. tit. 22, § 1261<br>Wash. Rev. Code § 48.99.010<br>W. Va. Code § 33-10-1<br>Wyo. Stat. Ann. § 26-28-101 | |

---

[246] According to N.M. Stat. Ann. § 59A-41-17, the definitions in N.M. Stat. Ann. §§ 59A-41-3–59A-41-13 are not part of New Mexico's version of the Uniform Act.

| § 5902 | Jurisdiction; venue; change of venue; exclusiveness of remedy; appeal | Ala. Code § 27-32-3<br>Alaska Stat. § 21.78.010(a)–(c)<br>Ariz. Rev. Stat. Ann. § 20-612(A)–(D)<br>Ark. Code. Ann. § 23-68-103(a)–(d)<br>Fla. Stat. § 631.021(1)–(4)<br>Me. Stat. tit. 24-a § 4354<br>Md. Code Ann. Ins. §§ 9-204, 9-209(a)[247]<br>Nev. Rev. Stat. § 696B.190[248]<br>N.J. Stat. Ann. §§ 17:30C-2–17:30C-3[249]<br>Okla. Stat. tit. 36, § 1902(A), (G)–(H)[250]<br>Or. Rev. Stat §§ 734.110, 734.120<br>W. Va. Code § 33-10-2(a)–(d)[251]<br>Wyo. Stat. Ann. § 26-28-102[252] | Alaska Stat. § 21.78.010 (no analog to 18 *Del. C.* § 5902 (b)–(c))<br>Ariz. Rev. Stat. Ann. § 20-612 (no analog to 18 *Del. C.* § 5902(c))<br>Ark. Code. Ann. § 23-68-101 (no analog to 18 *Del. C.* § 5902(c))<br>Cal. Ins. Code §§ 1064.1–1064.13 (no analog to 18 *Del. C.* § 5902)<br>Fla. Stat. § 631.021(3) (contains additional language not present in 18 *Del. C.* § 5902(d) analog)<br>Fla. Stat. § 631.021(5)–(7) (no DUILA analog)<br>215 Ill. Comp. Stat. 5/221.1–5/221.13 (no analog to 18 *Del. C.* § 5902)<br>La. Stat. Ann. §§ 22:2038–22:2044 (no analog to 18 *Del. C.* § 5902)<br>Md. Code Ann. Ins. § 9-209(c) ("venue of all delinquency proceedings is in Baltimore City"; no analog to 18 *Del. C.* § 5902(c), (e))<br>Mass Gen. Laws ch. 175 §§ 180A–180L ¾ (no analog to 18 *Del. C.* § 5902)<br>Mo. Rev. Stat. §§ 375.950–375.990 (no analogy to 18 *Del. C.* § 5902)<br>N.J. Stat. Ann. §§ 17:30C-2–17:30C-3 (no analog to 18 *Del. C.* § 5902(b)–(c), (e))<br>N.M. Stat. Ann. §§ 59A-41-17–59A-41-23 (no analog to 18 *Del. C.* § 5902)<br>N.Y. Ins. Law § 7421 (no analog to 18 *Del. C.* § 5902(a)–(b), (d)–(e); change of venue provision allows for removal at superintendent's discretion)<br>Okla. Stat. tit. 36, § 1902(B)–(E) (no DUILA analog; express provision preserving contractual arbitration rights)<br>Okla. Stat. tit. 36, § 1902(F) ("venue of all delinquency proceedings . . . shall be in Oklahoma County"; no analog to 18 *Del. C.* § 5902(c))<br>Wash. Rev. Code §§ 48.99.010–48.99.080 (no analog to 18 *Del. C.* § 5902)<br>W. Va. Code § 33-10-2(e) (allows removal of principal office of insurer to Kanawha County and then transfer of proceedings there; differs from 18 *Del. C.* § 5902(c)) |

[247] Md. Code Ann. Ins. §§ 9-204, 9-209(a) generally parallel 18 *Del. C.* § 5902(a), (d). According to Md. Code Ann. Ins. § 9-202(a), these sections are not part of Maryland's version of the Uniform Act.

[248] According to Nev. Rev. Stat. § 696B.280, Nev. Stat. § 696B.190 is not part of Nevada's version of the Uniform Act.

[249] According to N.J. Stat. Ann. § 17:30C-23(a), N.J. Stat. Ann. §§ 17:30C-2–17:30C-3 are not part of New Jersey's version of the Uniform Act.

[250] According to Okla. Stat. tit. 36, § 1921(A), Okla. Stat. tit. 36, § 1902 is not part of Oklahoma's version of the Uniform Act.

[251] According to W. Va. Code § 33-10-21(a), W. Va. Code § 33-10-2 is not part of West Virginia's version of the Uniform Act.

[252] According to Wyo. Stat. Ann. § 26-28-119(a), Wyo. Stat. Ann. § 26-28-102 is not part of Wyoming's version of the Uniform Act.

| DUILA § | Description | Analogs | UILA State Alternatives |
|---------|-------------|---------|--------------------------|
| § 5903 | Commencement of delinquency proceedings by Commissioner | Ala. Code § 27-32-4<br>Alaska Stat. § 21.78.020(b)<br>Ariz. Rev. Stat. Ann. § 20-613(A)<br>Ariz. Rev. Stat. Ann. § 20-631<br>Ark. Code. Ann. § 23-68-104<br>Fla. Stat. § 631.031(2)<br>Md. Code Ann. Ins. § 9-210[253]<br>N.J. Stat. Ann. § 17:30C-4(a), (d)<br>N.Y. Ins. Law § 7417[254]<br>Okla. Stat. tit. 36, § 1903<br>Or. Rev. Stat §§ 734.130(1), (4)<br>Wyo. Stat. Ann. § 26-28-103 | Alaska Stat. § 21.78.020(a), (c)–(f) (no DUILA analog)<br>Ariz. Rev. Stat. Ann. § 20-613(B)–(C) (no DUILA analog)<br>Cal. Ins. Code §§ 1064.1–1064.13 (no analog to 18 *Del. C.* § 5903)<br>Fla. Stat. § 631.031(1), (3), (4) (no DUILA analog)<br>215 Ill. Comp. Stat. 5/221.1–5/221.13 (no analog to 18 *Del. C.* § 5903)<br>La. Stat. Ann. §§ 22:2038–22:2044 (no analog to 18 *Del. C.* § 5903)<br>Me. Stat. tit. 24-a §§ 4363–4369 (no direct analog to 18 *Del. C.* § 5903)<br>Mass Gen. Laws ch. 175 §§ 180A–180L ¾ (no analog to 18 *Del. C.* § 5903)<br>Mo. Rev. Stat. §§ 375.950–375.990 (no analogy to 18 *Del. C.* § 5903)<br>Nev. Rev. Stat. § 696B.250[255]<br>N.J. Stat. Ann. § 17:30C-4(c) (no DUILA analog)<br>N.M. Stat. Ann. §§ 59A-41-17–59A-41-23 (no analog to 18 *Del. C.* § 5903)<br>Or. Rev. Stat §§ 734.130(2)–(3), (5) (no DUILA analog; adds more detail)<br>Wash. Rev. Code §§ 48.99.010–48.99.080 (no analog to 18 *Del. C.* § 5903)<br>W. Va. Code § 33-10-4a (different and more detailed provision governing commencement of proceeding) |
| § 5913 | Conduct of delinquent proceedings | Ala. Code § 27-32-15<br>Alaska Stat. § 21.78.130<br>Ariz. Rev. Stat. Ann. § 20-624(A)–(E) | Ariz. Rev. Stat. Ann. § 20-624 (no analog to 18 *Del. C.* § 5913(f))<br>Fla. Stat. § 631.141(3), (7)–(9), (10)(b)–(13) (no DUILA analog) |

---

[253] Md. Code Ann. Ins. § 9-210 generally parallels 18 *Del. C.* § 5903. According to Md. Code Ann. Ins. § 9-202(a), this section is not part of Maryland's version of the Uniform Act.

[254] According to N.Y. Ins. Law § 7408, N.Y. Ins. Law § 7417 is not part of New York's version of the Uniform Act.

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| | against domestic and alien insurers | Ark. Code. Ann. § 23-68-113<br>Cal. Ins. Code § 1064.2[256]<br>Fla. Stat. § 631.141(1)–(2), (4)–(6), (10)(a)<br>Me. Stat. tit. 24-a § 4364(1)–(6)<br>Md. Code Ann. Ins. §§ 9-207(a), 9-218(a)–(d)<br>Mo. Rev. Stat. § 375.954<br>Nev. Stat. § 696B.290(1)–(6)<br>N.J. Stat. Ann. §§ 17:30C-15, 17:30C-17<br>N.M. Stat. Ann. § 59A-41-18(A)–(C)<br>N.Y. Ins. Law § 7409(a)–(c)<br>Okla. Stat. tit. 36, § 1914(A)–(F)(1)<br>Or. Rev. Stat §§ 734.210(1), (4), 734.220(1), 734.230[257]<br>27 R.I. Gen. Laws §§ 27-14.4-3–27-14.4-5<br>V.I. Code Ann. tit. 22, § 1262 | 215 Ill. Comp. Stat. 5/221.1–5/221.13 (no analog to 18 *Del. C.* § 5913)<br>La. Stat. Ann. §§ 22:2038–22:2044 (no analog to 18 *Del. C.* § 5913)<br>Me. Stat. tit. 24-a § 4364(7) (no DUILA analog)<br>Mass Gen. Laws ch. 175 §§ 180B–180C (similar topic to 18 *Del. C.* § 5913 but different language and approach)<br>Nev. Stat. § 696B.290(7) (no DUILA analog)<br>N.M. Stat. Ann. §§ 59A-41-18(D)–(E) (no DUILA analog)<br>N.Y. Ins. Law § 7409(d) (no DUILA analog)<br>Okla. Stat. tit. 36, § 1914(A)–(F)(2)–(3) (no DUILA analog)<br>Or. Rev. Stat §§ 734.210(2)–(3), 734.220(2) (no DUILA analog or different; different approach to topics covered in 18 *Del. C.* § 5913(b)–(c))<br>V.I. Code Ann. tit. 22, § 1262 (no analog to 18 *Del. C.* § 5913(f))<br>W. Va. Code § 33-10-14(f)–(g) (adds more detail concerning compensation and role of special deputies not present in 18 *Del. C.* § 5913(f)) |

[255] Nev. Stat. § 696B.250 covers similar substance to 18 *Del. C.* § 5903 but differs somewhat in language and approach. According to Nev. Rev. Stat. § 696B.280, Nev. Stat. § 696B.250 is not part of Nevada's version of the Uniform Act.

[256] Cal. Ins. Code § 1064.2 generally tracks 18 *Del. C.* § 5913. But the California statute adds language providing that the receiver shall conduct the business of the insurer or take steps for the purpose of liquidating, rehabilitating, reorganizing, or conserving the affairs of the insurer "in accordance with those procedures that the receiver may petition the court to establish." Cal. Ins. Code § 1064.2(c).

[257] Or. Rev. Stat § 734.230 contains language not present in the Delaware analog.

13

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| | | Wash. Rev. Code § 48.99.020<br>W. Va. Code § 33-10-14<br>Wyo. Stat. Ann. § 26-28-112 | |
| § 5914 | Conduct of delinquency proceedings against foreign insurers | Ala. Code § 27-32-16<br>Alaska Stat. § 21.78.140<br>Ariz. Rev. Stat. Ann. § 20-625<br>Ark. Code. Ann. § 23-68-115<br>Cal. Ins. Code §§ 1064.3(a)–(b), 1064.10<br>Fla. Stat. § 631.152(1)(a)–(b), (2)–(3)<br>215 Ill. Comp. Stat. 5/221.2[258]<br>La. Stat. Ann. § 22:2039<br>Me. Stat. tit. 24-a § 4365<br>Md. Code Ann. Ins. § 9-219<br>Mass Gen. Laws ch. 175 § 180E (second and third paragraphs)<br>Mo. Rev. Stat. §§ 375.958, 375.986<br>Nev. Stat. § 696B.300<br>N.J. Stat. Ann. § 17:30C-16<br>N.M. Stat. Ann. § 59A-41-19<br>N.Y. Ins. Law § 7410<br>Okla. Stat. tit. 36, § 1915<br>Or. Rev. Stat §§ 734.240, 734.250<br>27 R.I. Gen. Laws §§ 27-14.4-6, 27-14.4-7, 27-14.4-17 | Cal. Ins. Code § 1064.3(c) (no DUILA analog)<br>Fla. Stat. § 631.152(1)(c), (4) (no DUILA analog)<br>Mass Gen. Laws ch. 175 § 180E (first paragraph diverges from 18 *Del. C.* § 5914(a))<br>Mo. Rev. Stat. § 375.958 (petition by 10+ state residents not included as basis for ancillary receivership as in 18 *Del. C.* § 5914(a)(2)) |

---

[258] 215 Ill. Comp. Stat. 5/221.2 differs in form from 18 *Del. C.* § 5914 but generally tracks its substance.

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| | | V.I. Code Ann. tit. 22, § 1263<br>Wash. Rev. Code § 48.99.030<br>W. Va. Code § 33-10-15<br>Wyo. Stat. Ann. § 26-28-113 | |
| § 5915 | Claims of nonresidents against domestic insurers | Ala. Code § 27-32-17<br>Alaska Stat. § 21.78.150<br>Ariz. Rev. Stat. Ann. § 20-626<br>Ark. Code. Ann. § 23-68-116<br>Cal. Ins. Code § 1064.4<br>Fla. Stat. § 631.161[259]<br>215 Ill. Comp. Stat. 5/221.3<br>La. Stat. Ann. § 22:2040<br>Me. Stat. tit. 24-a § 4366[260]<br>Md. Code Ann. Ins. § 9-226(f)<br>Mass Gen. Laws ch. 175 § 180F (first three paragraphs)<br>Mo. Rev. Stat. § 375.962<br>Nev. Stat. § 696B.310<br>N.J. Stat. Ann. § 17:30C-18<br>N.M. Stat. Ann. § 59A-41-20<br>N.Y. Ins. Law § 7412 | |

---

[259] Fla. Stat. § 631.161(1) generally tracks 18 *Del. C.* § 5915. But the Florida statute adds language providing that "claimants residing in foreign countries or in states which are not reciprocal *must* file claims in this state." Fla. Stat. § 631.161(1) (emphasis added). Fla. Stat. § 631.161 also refers to a "liquidation proceeding," while the Delaware analog refers to a "delinquency proceeding."

[260] Me. Stat. tit. 24-a § 4366(1) specifies that "claimants residing in foreign countries or in states not reciprocal states must file claims in this State." This language does not appear in 18 *Del. C.* § 5915(a).

15

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| | | Okla. Stat. tit. 36, § 1916<br>Or. Rev. Stat § 734.260<br>27 R.I. Gen. Laws §§ 27-14.4-8–27-14.4-9<br>V.I. Code Ann. tit. 22, § 1264<br>Wash. Rev. Code § 48.99.040<br>W. Va. Code § 33-10-16<br>Wyo. Stat. Ann. § 26-28-114 | |
| § 5916 | Claims against foreign insurers | Ala. Code § 27-32-18<br>Alaska Stat. § 21.78.160<br>Ariz. Rev. Stat. Ann. § 20-627<br>Ark. Code. Ann. § 23-68-117<br>Cal. Ins. Code § 1064.5<br>Fla. Stat. § 631.171(1)–(2), (4)[261]<br>215 Ill. Comp. Stat. 5/221.4<br>La. Stat. Ann. § 22:2041<br>Me. Stat. tit. 24-a § 4367(1)–(2)<br>Md. Code Ann. Ins. § 9-226(g)<br>Mass Gen. Laws ch. 175 § 180/<br>Mo. Rev. Stat. § 375.966<br>Nev. Stat. § 696B.320<br>N.J. Stat. Ann. § 17:30C-19<br>N.M. Stat. Ann. § 59A-41-21<br>N.Y. Ins. Law § 7412<br>Okla. Stat. tit. 36, § 1917<br>Or. Rev. Stat § 734.270 | Fla. Stat. § 631.171(1)–(3) (diverging from DUILA, in order for claimants to have the option to file claims with the ancillary receiver, the Florida receiver must have issued a notice to file claims pursuant to Fla. Stat. § 631.181(3))<br>Me. Stat. tit. 24-a § 4367(3) (no DUILA analog) |

---

[261] Fla. Stat. § 631.171 refers to a "liquidation proceeding," while 18 *Del. C.* § 5916 refers to a "delinquency proceeding."

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| | | 27 R.I. Gen. Laws §§ 27-14.4-10–27-14.4-11<br>V.I. Code Ann. tit. 22, § 1265<br>Wash. Rev. Code § 48.99.050<br>W. Va. Code § 33-10-17<br>Wyo. Stat. Ann. § 26-28-115 | |
| § 5917 | Form of claim; filing of claim with receiver; report of claim to court with receiver's recommendation; notice; hearing | Ala. Code § 27-32-19<br>Alaska Stat. § 21.78.170(a)–(b)<br>Ariz. Rev. Stat. Ann. § 20-628<br>Ark. Code. Ann. § 23-68-118<br>Me. Stat. tit. 24-a § 4368<br>Md. Code Ann. Ins. § 9-226(b)–(e)[262]<br>Nev. Stat. § 696B.330(1)–(2)<br>N.J. Stat. Ann. § 17:30C-20<br>Okla. Stat. tit. 36, § 1918<br>Or. Rev. Stat § 734.280<br>W. Va. Code § 33-10-18(c), (f)<br>Wyo. Stat. Ann. § 26-28-116 | Alaska Stat. § 21.78.170(c)–(h) (subsections (c)–(h) diverge from DUILA, including by providing for different process for contested claims)<br>Cal. Ins. Code §§ 1064.1–1064.13 (no analog to 18 *Del. C.* § 5917)<br>Fla. Stat. §§ 631.181–631.182 (detailed provisions governing proof of claim process that differ significantly from 18 *Del. C.* § 5917)<br>215 Ill. Comp. Stat. 5/221.1–5/221.13 (no analog to 18 *Del. C.* § 5917)<br>La. Stat. Ann. §§ 22:2038–22:2044 (no analog to 18 *Del. C.* § 5917)<br>Mass Gen. Laws ch. 175 §§ 180A–180L ¾ (no analog to 18 *Del. C.* § 5917)<br>Mo. Rev. Stat. §§ 375.950–375.990 (no analog to 18 *Del. C.* § 5917)<br>Nev. Stat. § 696B.330(3)–(9) (subsections (3)–(9) diverge from DUILA, including by providing for different process for contested claims; hearings may be conducted by master or referee in first instance; amended in 2007 to provide that claims "must be filed in the manner and form established by the receiver" (among other changes)) |

[262] Md. Code Ann. Ins. § 9-226(b)–(e) generally parallels 18 *Del. C.* § 5917, except that the Maryland version expressly provides that "[e]ach *claimant* shall set forth in reasonable detail," differing from the passive voice in the DUILA version. Md. Code Ann. Ins. § 9-226(b)(1) (emphasis added). According to Md. Code Ann. Ins. § 9-202(a), Md. Code Ann. Ins. § 9-226(b)–(e) are not part of Maryland's Uniform Insurers Liquidation Act.

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| | | | N.M. Stat. Ann. §§ 59A-41-17–59A-41-23 (no analog to 18 *Del. C.* § 5917)<br>N.Y. Ins. Law §§ 7408–7415 (no analog to 18 *Del. C.* § 5917)<br>Okla. Stat. tit. 36, § 1918(A) (adds provision requiring claimants to comply with receiver's information requests)<br>V.I. Code Ann. tit. 22, §§ 1261–1268 (no analog to 18 *Del. C.* § 5917)<br>Wash. Rev. Code §§ 48.99.010–48.99.080 (no analog to 18 *Del. C.* § 5917)<br>W. Va. Code § 33-10-18(a), (b), (d), (e) (additional language regarding required filings with claims; different process for contested claims) |
| § 5918 | Priority of certain claims | Ala. Code § 27-32-20(a)–(d)<br>Alaska Stat. § 31.78.180(a)–(c)<br>Ariz. Rev. Stat. Ann. § 20-629(A), (B)–(E)<br>Ark. Code. Ann. § 23-68-119(1)–(4)<br>Cal. Ins. Code §§ 1064.6–1064.8<br>Fla. Stat. § 631.191(1)–(2)(a)<br>215 Ill. Comp. Stat. 5/221.5–5/221.7<br>La. Stat. Ann. § 22:2042<br>Md. Code Ann. Ins. § 9-227(e)–(f), (h)–(i)<br>Mass Gen. Laws ch. 175 §§ 180F, 180J, 180K<br>Mo. Rev. Stat. §§ 375.970, 375.974, 375.978<br>N.J. Stat. Ann. § 17:30C-21 | Ala. Code § 27-32-20 (no analog to 18 *Del. C.* § 5918(e))<br>Alaska Stat. § 21.78.180(d)–(e) (subsections (d)–(e) diverge from DUILA)<br>Ariz. Rev. Stat. Ann. § 20-629 (A), (D), (F) (somewhat different priority schedule than DUILA)<br>Ark. Code. Ann. § 23-68-119 (no analog to 18 *Del. C.* § 5918(e))<br>Cal. Ins. Code §§ 1064.6–1064.8 (no analog to 18 *Del. C.* § 5918(e))<br>Fla. Stat. § 631.191(2)(b)–(h) (no DUILA analog)<br>Fla. Stat. § 631.271 (priority scheme differs somewhat from analogs in 18 *Del. C.* § 5918(a), (e); no analog to 18 *Del. C.* § 5918(b))<br>215 Ill. Comp. Stat. 5/221.5–5/221.7 (no analog to 18 *Del. C.* § 5918(e))<br>La. Stat. Ann. § 22:2042(E) (no DUILA analog; no analog to 18 *Del. C.* § 5918(e))<br>Me. Stat. tit. 24-a §§ 4363–4369 (no analog to 18 *Del. C.* § 5918)[263] |

---

[263] Maine has not adopted the Uniform Act priority scheme; it has separate provisions governing priorities. *See* Me. Stat. tit. 24-a § 4379.

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| | | N.M. Stat. Ann. § 59A-41-22<br>N.Y. Ins. Law § 7413<br>Okla. Stat. tit. 36, § 1919<br>Or. Rev. Stat §§ 734.290–734.310<br>27 R.I. Gen. Laws §§ 27-14.4-12–27-14.4-15<br>V.I. Code Ann. tit. 22, § 1266<br>Wash. Rev. Code § 48.99.060<br>W. Va. Code §§ 33-10-19, 33-10-19a<br>Wyo. Stat. Ann. § 26-28-117 | Md. Code Ann. Ins. § 9-227(g) (no DUILA analog; no analog to 18 *Del. C.* § 5918(e))<br>Mass Gen. Laws ch. 175 § 180F (parallels topic of 18 *Del. C.* § 5918(e) but differs somewhat in language and approach)<br>Mo. Rev. Stat. §§ 375.970, 375.974, 375.978 (no analogy to 18 *Del. C.* § 5918(e))<br>Nev. Stat. §§ 696B.290–696B.340 (no analog to 18 *Del. C.* § 5918)<br>N.J. Stat. Ann. § 17:30C-21 (no analog to 18 *Del. C.* § 5918(e))<br>N.M. Stat. Ann. § 59A-41-22(E) (no DUILA analog; subrogated claims of guarantee fund preferred over unsecured creditor claims; no analog to 18 *Del. C.* § 5918(e))<br>N.Y. Ins. Law § 7413 (no analog to 18 *Del. C.* § 5918(e))<br>Okla. Stat. tit. 36, § 1919 (no analog to 18 *Del. C.* § 5918(e))<br>27 R.I. Gen. Laws § 27-14.4-20 (priority of distribution scheme differs from 18 *Del. C.* § 5918(e))<br>V.I. Code Ann. tit. 22, § 1266(a) (first sentence differs from 18 *Del. C.* § 5918(a) given territory status; no analog to 18 *Del. C.* § 5918(b), (e))<br>Wash. Rev. Code § 48.99.060 (no analog to 18 *Del. C.* § 5918(e))<br>W. Va. Code § 33-10-19a (priority scheme generally tracks 18 *Del. C.* § 5918(e) but differs somewhat in wording and approach)<br>Wyo. Stat. Ann. § 26-28-119 (no analog to 18 *Del. C.* § 5918(e)) |
| § 5919 | Attachment and garnishment of assets | Ala. Code § 27-32-21<br>Alaska Stat. § 21.78.190<br>Ariz. Rev. Stat. Ann. § 20-630(A)<br>Ark. Code. Ann. § 23-68-120<br>Cal. Ins. Code § 1064.9<br>Fla. Stat. § 631.201 | Ariz. Rev. Stat. Ann. § 20-630(B) (no DUILA analog) |

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| | | 215 Ill. Comp. Stat. 5/221.9[264] La. Stat. Ann. § 22:2043 Me. Stat. tit. 24-a § 4369 Md. Code Ann. Ins. § 9-220 Mass Gen. Laws ch. 175 § 180F (penultimate paragraph) Mo. Rev. Stat. § 375.982 Nev. Stat. § 696B.340 N.J. Stat. Ann. § 17:30C-22 N.M. Stat. Ann. § 59A-41-23 N.Y. Ins. Law § 7414 Okla. Stat. tit. 36, § 1920 Or. Rev. Stat § 734.320 27 R.I. Gen. Laws § 27-14.4-16 V.I. Code Ann. tit. 22, § 1267 Wash. Rev. Code § 48.99.070 W. Va. Code § 33-10-20 Wyo. Stat. Ann. § 26-28-118 | |
| § 5920 | UILA title and interpretive guidance to effectuate purpose of uniform law | Ala. Code § 27-32-22 Alaska Stat. § 21.78.200 Ariz. Rev. Stat. Ann. § 20-631 Ark. Code. Ann. § 23-68-101 Cal. Ins. Code § 1064.12(a)–(b) | Cal. Ins. Code § 1064.12(c)–(d) (no DUILA analog) Fla. Stat. §§ 631.001–631.401 (Florida labels its statute the "Insurers Rehabilitation and Liquidation Act" and has adopted several provisions based on the IRLMA). Me. Stat. tit. 24-a § 4363(2) (no DUILA analog) |

---

[264] 215 Ill. Comp. Stat. 5/221.9 parallels the first sentence of 18 *Del. C.* § 5919 but lacks the second sentence regarding voiding liens obtained within 4 months before the commencement of the delinquency proceeding.

| DUILA § | Description | Analogs | UILA State Alternatives |
|---|---|---|---|
| | | 215 Ill. Comp. Stat. 5/221.13[265]<br>La. Stat. Ann. § 22:2044<br>Me. Stat. tit. 24-a § 4363(1), (3)<br>Md. Code Ann. Ins. § 9-202<br>Mo. Rev. Stat. § 375.990<br>N.J. Stat. Ann. § 17:30C-23<br>N.M. Stat. Ann. § 59A-41-17<br>N.Y. Ins. Law §§ 7408, 7415<br>Okla. Stat. tit. 36, § 1921<br>27 R.I. Gen. Laws § 27-14.4-23<br>V.I. Code Ann. tit. 22, § 1268<br>Wash. Rev. Code § 48.99.080<br>W. Va. Code § 33-10-21<br>Wyo. Stat. Ann. § 26-28-119 | Mass Gen. Laws ch. 175 §§ 180A–180L ¾ (no analog to 18 *Del. C.* § 5920; no express adoption of Uniform Act)<br>Nev. Rev. Stat. § 696B.280[266] |

---

[265] 215 Ill. Comp. Stat. 5/221.10 provides additional detail about the purpose and construction of the Illinois statute beyond the common Uniform Act language.

[266] In 2019, Nevada amended Nev. Rev. Stat. § 696B.280 to provide that the provisions of its version of the Uniform Act "shall be so interpreted as to effectuate the general purpose to make uniform the laws of those states which enact the Uniform Insurers Liquidation Act *or the Insurer Receivership Model Act*." Nev. Rev. Stat. § 696B.280(3) (emphasis added).